

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

JMM:BTR:CPK
F.#2011R01004

*610 Federal Plaza*
*Central Islip, New York 11722*

July 11, 2014

By Hand and ECF

The Honorable Joseph F. Bianco
United States District Judge
United States District Court
Eastern District of New York
924 Federal Plaza
Central Islip, New York 11722-4454

      Re: United States v. Adam Valasquez
           Docket No. 11 CR 639(S-8)(JFB)

Dear Judge Bianco:

      The government submits this letter brief in opposition to defendant's Rule 29 motion for a judgment of acquittal on the defendant's conviction for money laundering conspiracy. On May 1, 2014, defendant Adam Valasquez ("defendant") was convicted by a jury of five counts, Hobbs Act Robbery Conspiracy, Hobbs Act Robbery, Brandishing of a Firearm During Crime of Violence, Conspiracy to Distribute Controlled Substances and Conspiracy to Launder Money. (Docket Number 316) (hereinafter,"Doc. No."). At trial, defendant moved for Rule 29 dismissal of all counts based on insufficient evidence. (Trial Transcript ("Tr.") 1059). The Court denied that motion as to Counts One through Seven, including four of the counts of conviction, stating that "there is no question that there is sufficient proof with respect to each and every element of these, counts one through seven." (Tr. 1060). The Court reserved judgment as to Count Eight, the fifth count of conviction, which charged conspiracy to commit money laundering stating that the court needed to "go back over the transcript and make sure there is sufficient evidence with respect to all those elements." (Tr. 1059).

      As set forth below, a review of the transcript demonstrates that there is more than sufficient proof of

defendant's involvement in a money laundering conspiracy. Therefore, the Court should deny the motion to set aside the jury's guilty verdict as to Count Eight, the money laundering conspiracy.  As the evidence showed, defendant was engaged in an ongoing criminal conspiracy to do home invasion robberies of drug dealers and sell the stolen drugs obtained in those robberies.  This conspiracy necessarily involved financial transactions in (i) the distribution of robbery proceeds among the co-conspirators, (ii) the sale of illegal drugs stolen in the robberies and (iii) the distribution of proceeds from the sale of illegal drugs among the co-conspirators.  As discussed below, those financial transactions affected interstate commerce and were intended to promote, encourage, and enable the ongoing criminal enterprise.

## I. Legal Standard

In deciding a defendant's Rule 29 motion, district courts resolve all inferences in favor of the prosecution.  See United States v. Puzzo, 928 F.2d 1356, 1361 (2d Cir. 1991).  Likewise, the court views evidence in the light most favorable to the government.  See United States v. Temple, 447 F.3d 130, 137, 139 (2d Cir. 2006).  To grant the defendant's motion, the Court must find the evidence pointing to guilt must be "nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt."  United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999).

## II. The §1956(h) Charge

In its charge, the Court instructed the jury that to convict Valasquez of conspiracy to launder money, they needed to find beyond a reasonable doubt that Valasquez and his co-conspirators "came to a mutual understanding to try and accomplish a common and unlawful plan," the object of which was to commit the following three elements:

    1) "the defendant conducted a financial transaction  involving property constituting the proceeds of specified unlawful activity, namely, the distribution of controlled substances, or the obstruction of commerce by robbery;

    2) the defendant knew the property involved in the financial transaction was the proceeds of some form of unlawful activity;

    3) the defendant acted with the intent to promote the carrying on of the specified unlawful activity." (Tr. 1208).

 In its instructions, the Court defined transaction as any "purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition of property" and defined "financial transaction" as "a transaction which in any way or degree affect interstate or foreign commerce and involves the movement of funds by wire or other means." (Tr. 1209).

 The Court also informed the jurors that because Valasquez was charged with conspiracy, it was sufficient that Valasquez knowingly joined the conspiracy to commit the offense. (Tr. 1208-09). The court did not require the jury to find an overt act in furtherance of the conspiracy to convict and that position is in accord with settled law that the government need not prove the defendant or anyone else committed any overt acts in furtherance of the conspiracy. See Whitfield v. United States, 543 U.S. 209, 211 (2005).

### III. Argument

 The Court should deny defendant's Rule 29 motion because ample evidence was presented at trial for the jury to conclude he engaged in a money laundering conspiracy. Defendant's other convictions and the court's ruling regarding the Rule 29 motion as to those convictions are relevant to this issue. The Court denied the defendant's Rule 29 motion and upheld those convictions stating that there was "no question" that each and every element of those conspiracies was proven by sufficient evidence (Tr. 1059-1060). As set forth below, those convictions, when combined with the fact that the defendant's criminal enterprise was ongoing and indefinite, provide sufficient evidence for each element of conspiracy to launder money. Because Valasquez's criminal conspiracy was ongoing, proceeds generated from the specified unlawful activity, namely Hobbs Act robberies and narcotics

sales, were distributed among the co-conspirators and necessarily used in financial transactions which promoted the criminal enterprise and facilitated further criminal acts.

Defendant's citation of United States v. Jolivet, 224 F.3d 902 (8th Cir. 2000) does not aid his argument. There, the court held that a singular act of depositing checks could not promote an already completed crime. Here, in contrast, there are ongoing crimes which are being promoted by the financial transactions including Hobbs Act robberies, narcotics trafficking and conspiracies.

    A.    An Abundance of Evidence Supports the Jury's Conclusion that Defendant Participated in a Criminal Conspiracy to Commit Money Laundering

To prove a defendant participated in a conspiracy to launder money in violation of 18 U.S.C. § 1956(h), the evidence presented at trial must show the defendant and others formed a mutual understanding to try and accomplish a common and unlawful plan. (Tr. 1208). In this case, the existence of a mutual agreement to launder money is readily inferred from the multitude of criminal acts including burglaries[1], Hobbs Act robberies and sales of illegal drugs stolen in those robberies, in which the defendant and his co-conspirators participated. To illustrate, at trial, several of Valasquez's co-defendants testified that Valasquez participated in the following crimes with the Timothy Glass crew:

- Valasquez offered to introduce Glass to a man to whom Glass could sell the illegal drugs obtained in the crew's home invasion robberies. Subsequently, at Valasquez's house, where the meeting was to be held, instead of selling the drugs obtained in the robbery, Glass gave Valasquez a few ounces of marijuana but left the meeting

---

[1] Although not a specified unlawful activity, the evidence that the defendant engaged in burglaries with the Glass Crew is relevant to this motion as the evidence demonstrates a similar pattern and intent in having the proceeds distributed to the co-conspirators to promote continued participation in the ongoing criminal conspiracies. (Tr. 476, 687 and 972).

because he felt uncomfortable. (Glass at page 568 of the trial transcript ("Glass at 568")).

- In December 2008, Valasquez participated in the burglary of a New Jersey warehouse in which the robbery crew stole counterfeit clothing items. (Glass at 423; Michaelides at 971).

- In January 2009, Valasquez participated in the robbery of a doctor's office (Glass at 473).

- In January 2009, Valasquez participated in the robbery of what was believed to be a marijuana grow house on 152nd street in Queens. (Lovly at 225; Glass at 442; Michaelides at 967).

- In February 2009, Valasquez and others burglarized a construction site at the intersection of 14th street and the Cross Island Parkway in Queens. (Glass at 474).

- In March 2009, Valasquez and others robbed the business at Glen Oaks bar in Astoria, Queens. (Glass at 482).

- In November 2009, Valasquez participated in the robbery of a house on 99th street in Queens. (Odoms at 851). After the 99th Street robbery, Valasquez attended a meeting at Citifield in Queens where the Glass crew agreed to do another robbery immediately with the Rodriguez crew. As agreed, Valasquez then participated in the robbery of an apartment in Brooklyn. (Odoms at 888).

    B.    The Conspiracy in which the Defendant Participated Contemplated All Elements of a Money Laundering Conspiracy

        1.    Defendant's Money Laundering Conspiracy Contemplated Financial Transactions Using What He Knew Would Be the Proceeds of Specified Unlawful Activities

Defendant's money laundering conspiracy contemplated as its object financial transactions using the proceeds of the robberies. Such transactions included the distribution of cash proceeds as well as the sale of stolen drugs and distribution of the proceeds of such sales to conspirators

including the defendant. The term financial transaction means "a transaction which in any way or degree affects interstate or foreign commerce (i) involving the movement of funds by wire or other means." 18 U.S.C. § 1956(c)(4). A transaction is defined as "a purchase, sale, loan, pledge, gift, transfer, delivery, or other disposition." 18 U.S.C. § 1956(c)(3).

After each robbery, Valasquez and his co-conspirators conducted a number of financial transactions involving both the proceeds of the robberies and drug sales. For example, following the robbery of what the conspirators believed to be a marijuana grow house on 152nd street, Valasquez and his co-conspirators returned to Glass's home to distribute the cash taken during the robbery. (Tr. 460-462). This distribution of stolen cash following the robbery of the drug dealer's home was a financial transaction because it involved the disposition of funds, namely U.S. currency, from Glass to, among others, Valasquez.

A second financial transaction occurred when Glass sold the marijuana robbed from the drug dealer's house which impacted interstate commerce as it involved the sale of illegal drugs. (Tr. 460-462). This constituted a sale of goods in return for funds. The following day, yet a third financial transaction arising out of the 152nd Street robbery occurred when the proceeds of the marijuana sale were distributed to Valasquez and other co-conspirators. (Tr. 460-462). Again, this was a financial transaction involving the transfer of funds which affected interstate commerce as it promoted additional Hobbs Act robberies. In sum, for this one robbery, there were at least three separate financial transactions arising out of it.

Further, the distribution of proceeds following the doctor's office robbery was another example of a financial transaction because Glass received the proceeds from Valasquez in one transaction and then in another transaction, Glass distributed the proceeds to his co-conspirators, including Valasquez. (Tr. 473). In this connection, although the robbery of the doctor's office was an acquitted count, the significance of this evidence is not for the court to

evaluate. As stated in Federal Criminal Practice Second Circuit Handbook at 527, on a Rule 29 motion, "the court may not assess witness credibility, resolve inconsistent testimony against the verdict or otherwise weigh the significance of the evidence. United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000)."

Defendant agreed, as part of the money laundering conspiracy, that drug dealers homes would be robbed and the illegal drugs obtained from the robberies would be sold. Certainly, those financial transactions, particularly the ones involving the sale and distribution of marijuana and the division of proceeds from those sales among co-conspirators, effect interstate commerce. Indeed, a Stipulation was entered at trial to the effect, in part, that "the possession, use and distribution of marijuana in New York state has an effect on interstate or foreign commerce." (Tr. 1032). Accordingly, there is no dispute that the transactions agreed to as part of the conspiracy were financial transactions in that they involved sales and disposition of property and had an effect on interstate commerce. That defendant knew these were proceeds of Hobbs Act robberies is evident from the testimony that he participated in the robberies. (Tr. 225, 442, 482, 568, 851, 888 and 967).

> 2. As part of Defendant's Conspiracy, He Agreed That Proceeds From Robberies and the Sale of Drugs Stolen in the Robberies Would Be Distributed After Each Robbery to Promote Future Robberies

The evidence presented at trial was sufficient to show the defendant participated in a series of Hobbs Act robberies and conspired to distribute narcotics. Indeed, the jury convicted him on those charges, and the Court denied the defendant's Rule 29 motion to acquit on them. When these convictions are combined with the *ongoing nature of the conspiracy*, it follows that the funds acquired were necessarily used to promote and facilitate further crimes.

The defendant bases his motion, in part, on the unfounded assertion that "in no way was this money reinvested

in the alleged criminal conspiracy." (Doc. No. 335 at 2). In fact, the financial transactions detailed above were intended to promote the continuation of the specified unlawful activities, namely the Hobbs Act home invasion robberies and drug trafficking. The distribution of the cash proceeds to the conspirators following the robberies, burglaries, and drug sales promoted the continuation of the criminal scheme by encouraging the members of the conspiracy to participate in additional crimes. (Tr. 460-462, 464); <u>United States v. Warshak</u>, 631 F.3d 266, 319 (6th Cir. 2010) (stating the distribution of proceeds to employees of a fraud scheme to "encourage future commitment to the criminal endeavor" promoted the scheme); <u>United States v. Alerre</u>, 430 F.3d 681, 695 (4th Cir. 2005) (stating the distribution of proceeds to codefendants promotes the underlying fraud scheme); See <u>United States v. Thorn</u>, 317 F.3d 107, 132 (2d Cir. 2003); <u>United States v. Skinner</u>, 946 F.2d 176, 177-178 (2d Cir. 1991). Additionally, after Valasquez and others robbed a doctor's office in January 2009, they gave Glass cash for "gas money." (Tr. 473). Finally, Glass used proceeds from the robberies and drug sales to pay the rent on his home that was used as the conspiracy's headquarters. (Tr. 645-47).

In sum, there was ample evidence for the jury to conclude that defendant was guilty of each element of the crime of conspiracy to commit money laundering.

## IV. Conclusion

For the reasons explained above, the defendant's Rule 29 motion to set aside the jury's guilty verdict on the conspiracy to launder money charge should be denied. Accordingly, the Court should uphold the Count Eight money laundering conspiracy conviction because the evidence


presented at trial was sufficient for the jury to find that the defendant participated in a conspiracy to launder money in violation of 18 U.S.C. § 1956(h).

                            Respectfully submitted,

                            LORETTA E. LYNCH
                            United States Attorney

                     By: */Charles P. Kelly*_____
                            Burton T. Ryan, Jr.
                            Charles P. Kelly
                            Assistant U. S. Attorneys
                            (631) 715-7853 (66)

cc: Edward Jenks, Esq.
    Counsel for Defendant

---

The government gratefully acknowledges the assistance of William H. LaGrange, a second year law student at Duke University School of Law and Jacqueline Cangero, a second year law student at Boston University School of Law, for their contributions to the preparation of this letter brief.