# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ JUN 24 2016 ★
LONG ISLAND OFFICE

№ 11-CR-639 (JFB)

UNITED STATES OF AMERICA,

VERSUS

ADAM VELAZQUEZ,

Defendant.

## MEMORANDUM AND ORDER
June 24, 2016

JOSEPH F. BIANCO, District Judge:

On May 1, 2014, a jury convicted defendant Adam Velazquez ("Velazquez" or "defendant") of five crimes related to defendant's participation in a conspiracy to rob drug traffickers and business owners in New York City and Long Island.[1] Velazquez now moves for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure.

Velazquez asserts, among other things, that he should be granted a new trial based on the ineffective assistance of his trial counsel. Velazquez asserts that his trial counsel made numerous errors, including failing to investigate alibi evidence in the form of cell phone, work, and school records, and failing to introduce evidence that Velazquez did not in fact have a black, four-door sedan in 2009, as the government alleged. For the reasons set forth below, after careful consideration of the parties' written submissions, the trial record, and the evidentiary hearing, the Court grants the motion for a new trial based upon ineffective assistance of trial counsel.

As a threshold matter, having presided over the trial, it was apparent to the Court that defense counsel was prepared during the course of the trial, conducted thorough cross-examinations of the government's witnesses, and gave effective opening and closing statements to the jury. There is no doubt that he took his responsibility as defense counsel in this case very seriously, that he is an experienced and talented

---

[1] The jury returned a verdict of guilty with respect to the following counts charged in the superseding indictment: (1) Hobbs Act Robbery Conspiracy, 18 U.S.C. § 1951(a) (Count One); (2) Hobbs Act Robbery at 152nd Street in Queens, New York, 18 U.S.C. § 1951(a) (Count Three); (3) Brandishing of a Firearm During a Crime of Violence, 18 U.S.C. § 924(c)(1)(A)(ii) (Count Four); (4) Conspiracy to Distribute Controlled Substances, 21 U.S.C. §§ 841(a)(1), 846 (Count Seven); and (5) Conspiracy to Launder Money, 18 U.S.C. § 1956(h) (Count Eight). The jury acquitted defendant on the remaining three counts charged in the superseding indictment, which were (1) Interstate Transportation of Stolen Property, 18 U.S.C. § 2314 (Count Two); (2) Hobbs Act Robbery at 99th Street in Queens, New York (Count Five); and (3) Using or Carrying a Firearm During a Crime of Violence (Count Six).

defense lawyer, and that he used that experience to substantially undermine the government's case. The effectiveness of certain aspects of defense counsel's strategy and performance in the courtroom was confirmed by the jury's decision to acquit the defendant on several counts of the superseding indictment. In short, defense counsel's effort was apparent, his courtroom performance was effective in many respects, and his professionalism was at the highest level. Thus, the Court emphatically rejects any suggestion by the defendant that his trial counsel was completely lacking in effort or preparation. However, as discussed in detail below, defense counsel's performance was deficient in several major respects, including failing to develop evidence that would have been highly favorable to the defendant's case, erroneously entering into a stipulation regarding identifications of his client by two witnesses who did not testify at trial, and engaging in a line of questioning with a cooperating witness that unnecessarily bolstered the credibility of the witness and damaged the defendant's case. These failures, in the Court's view, satisfy the *Strickland* standard for ineffective assistance of counsel.

First, defense counsel failed to obtain and introduce defendant's cellular telephone records (including locational information), and additional evidence that would support and explain those records. In particular, defense counsel told his client that he would obtain those telephone records, but then unilaterally decided not to do so because trial counsel believed that such records would be useless given that the records would not confirm that it was the defendant (as opposed to someone else) using the telephone at any particular time and the government was alleging that the robbery crew used "burner" phones. That reasoning was fundamentally flawed in the context of this case, and cannot be attributed to trial

strategy, especially where there was no downside to obtaining and reviewing the records. Even though telephone records do not conclusively establish on their face who was using the phone at a given time, the records can often be used by the government or a defendant, in conjunction with other evidence or information, to strongly support the conclusion that it was the defendant (rather than some other third party) who was using the telephone at the relevant times. In fact, when new defense counsel obtained those records after the trial, the cellphone records and other records (such as college attendance and work records), in fact, provided substantial evidence, among other things, that: (1) defendant was in *Manhattan* at the time he was alleged to have participated in the 99th Street robbery in Queens and the St. Johns Place robbery in Brooklyn, both on November 23, 2009; and (2) defendant was in Woodhaven, Queens, around the time the 152nd Street robbery was alleged to have taken place in Whitestone, Queens.

Second, defense counsel failed to show his client the government's proposed trial exhibits prior to the trial, which prevented counsel from learning of favorable evidence to the defense that would have completely undermined one of the government's only pieces of evidence offered to corroborate the government's cooperating witnesses. Specifically, among the trial exhibits was Government Exhibit 7, which was a certified DMV document demonstrating that the defendant owned a black four-door sedan. The government argued that this exhibit was strong corroboration of the testimony of a cooperating witness that the defendant and his partner were in a black four-door sedan at the 99th Street robbery on November 23, 2009. The defendant was not shown this record prior to its introduction, and there was evidence that could have conclusively undermined that exhibit. In particular, the

2

DMV record related to 2008 (through the robbery was in November 2009) and, following the trial, based upon information provided by the defendant, new defense counsel was able to obtain uncontroverted proof (in the form of DMV and insurance records) demonstrating that the plates for that black sedan were surrendered and destroyed in June 2008 (over one year prior to the 99th Street robbery) because the defendant had wrecked the car in June 2008. In fact, there was even a reference on Exhibit 7 itself, indicating that the plate had been surrendered in 2008, which apparently neither the government nor defense counsel noticed. In short, it is clear that, if the defendant had been shown that document prior to trial and had time to discuss it with his attorney, counsel would have been able to obtain this evidence that would have definitively undermined the government's theory that Exhibit 7 established that defendant owned that black sedan at the time of the 99th Street robbery.

Finally, defense counsel entered into a stipulation with the government (Government Exhibit 10) regarding photo arrays that were shown to numerous witnesses during the investigation of the case. A portion of the stipulation was helpful to the defense because it indicated that six co-conspirators in the robbery crew and a robbery victim were each shown photo arrays containing the defendant and failed to identify the defendant. The stipulation, however, also indicated that five individuals positively identified the defendant in the photo arrays. Although three of those witnesses testified at the trial for the government, two of those witnesses never testified at all. Thus, the highly damaging inference from the stipulation was that two non-testifying co-conspirators from the robbery crew had also identified the defendant in connection with the robbery crew (even though their identifications were

unrelated to any charged crimes) or, at the very least, had identified the defendant in connection with some other criminal activity. In short, although the Court has carefully considered the explanations offered by trial counsel regarding these issues, the Court cannot attribute any of these decisions to trial strategy, but rather concludes, in each instance, that it was an error by trial counsel.[2] Moreover, the Court believes that, in the aggregate, these errors by trial counsel satisfy the first prong of the *Strickland* standard.

With respect to the prejudice prong of *Strickland*, this Court recognizes that a defense lawyer's failure to obtain phone or car records, even if such records would have been helpful to the defense, does not necessarily mean that such failures affected the outcome of the case. However, having presided over this particular trial, this Court concludes that it is reasonably likely that, had the jury heard this additional evidence (and had the other errors regarding the stipulation and Lovly cross-examination not occurred), the jury would not have convicted the defendant of any of the counts in this weak case. The only substantive robbery for which the jury returned a guilty verdict was the 152nd Street robbery of a drug dealer and

---

[2] Defendant also points to the fact that defense counsel spent an extensive amount of time on the cross-examination of cooperating witness Martin Lovly attempting to establish that, on January 29, 2013, Lovly sat next to the defendant in the courtroom at a pretrial conference and asked the defendant, "Who the hell are you?". Trial counsel made this issue an important part of his cross-examination by virtue of both the extent and the tone of his questioning on this particular point. However, the government later produced irrefutable evidence from the United States Marshal's Service and docket sheet that Lovly and the defendant never appeared in court on the same day, and trial counsel was forced to concede these facts in a stipulation, which clearly showed counsel had made a mistake in his cross-examination, and that he had confused Lovly with another co-defendant.

(from the verdict sheet and the evidence) it is highly likely that the other counts of conviction (robbery conspiracy, brandishing a firearm, conspiracy to distribute marijuana, and conspiracy to launder money) all arose from the jury's conclusion that the defendant participated in that robbery of a marijuana dealer, as well as the subsequent splitting of the proceeds from that robbery. The government's proof for that robbery was based primarily on the testimony of two cooperating witnesses – Martin Lovly ("Lovly") and Timothy Glass ("Glass") –whose out-of-court identifications were unusual (to say the least), and whose largely uncorroborated testimony contained numerous, and often troubling, inconsistencies with other proof in the case.

For example, Glass (the leader of this robbery crew who committed over 100 robberies) admitted that he did not know the defendant well and picked out another individual in a photo array as having done robberies with him and, after the circling of that other individual, an arrow was drawn on the array to the defendant to indicate Glass also knew the defendant. In other words, Glass picked out two co-conspirators in the same array. Moreover, Glass testified that he was introduced to the defendant by co-conspirator Gerry Machacek ("Machacek"), whom Glass understood knew the defendant extensively from other criminal activities. However, Machacek, who also was a cooperating witness for the government, failed to identify the defendant as someone he knew *at all* in three separate photo arrays. In addition, Glass's girlfriend (Teri Bedell), who is also a cooperating witness for the government and is alleged to have participated in the 152nd Street robbery (and the Advanced Dermatology robbery) with the defendant, also did not recognize the defendant in a photo array. Finally, Glass had stated, among other things, that the person known to him as "Rob" or "Alex," and who the government argued was the defendant (based upon the identification in the array), had the following personal characteristics: (1) he had a scar on his hand from a dog bite; (2) he was "in his early 20s" at the time of the robberies; and (3) he spoke Spanish. However, (1) it is uncontroverted that the defendant has no scar on his hand; (2) it is unconverted that the defendant was over 30 years old at the time of the alleged robberies; and (3) there is no evidence (independent of Glass) that the defendant speaks Spanish. It is clear that, even without the additional evidence that trial counsel did not obtain that would have been helpful to the defense (such as the cell phone records and car information), the jury already had significant issues with Glass's credibility because they found the defendant not guilty on two substantive counts – the New Jersey warehouse burglary (Count Two) and the Advanced Dermatology robbery (Counts Five and Six) – even though Glass testified extensively as to the defendant's alleged involvement in those crimes.

The other main cooperator on the 152nd Street robbery, Martin Lovly, also had substantial impeachment issues. Lovely had been involved in dozens of robberies and, when initially shown a photo of the defendant in an array, only identified him as someone he knew from a neighborhood barbershop rather than from a robbery. However, a week later, he positively identified the defendant as having participated in the 152nd Street robbery, even though (1) the robbery had occurred five years earlier, and Lovely had been involved in dozens of robberies; (2) Lovely said he met the defendant only an hour before the crime; and (3) Lovely was on heroin at the time of the robbery. Lovely also incorrectly told investigators that the defendant was a "dark skinned Dominican."

4

Thus, given these substantial weaknesses in the government's case, the Court concludes that it is highly likely that the introduction of the additional evidence in favor of the defense – such as the telephone records, school records, work records, and the evidence regarding the black sedan – would have impacted the government's case in such a way as to alter the outcome as to each of the counts of conviction. That real and substantial risk of a material impact on the trial's outcome was further magnified by the error with respect to the stipulation regarding positive identifications by two non-testifying government witnesses. Although the Court gave a curative instruction advising the jury not to consider those identifications by non-testifying witnesses, the Court is troubled by the real possibility that hearing about those identifications could have led the jury to wrongly believe that two non-testifying robbery crew members had also implicated the defendant in robberies, even though that was not true.[3]

The Court has carefully considered the government's arguments in opposition and finds them unpersuasive. First, the government argues that the additional telephone evidence is hardly conclusive proof that the defendant did not participate in the charged robberies. As an initial matter, the Court finds the telephone records and accompanying additional evidence to be compelling proof that the defendant did not participate in the 99th Street and St. Johns Place robberies on November 23, 2009 because he was in Manhattan. Moreover, as it relates to the 152nd Street robbery, although the exact date and time of that robbery are uncertain, there is testimony in the record from Glass and the robbery victim (and accompanying evidence) to support the defense argument that the robbery took place on January 13, 2009, and there are telephone records that would support defendant's position that he was not in Woodhaven at the approximate time the robbery was alleged to have taken place in Woodhaven on that day. Although this evidence is not conclusive proof that the defendant did not participate in the 152nd Street robbery, the test is not "conclusiveness" – rather, the test is whether there is a reasonable probability that, absent the errors, the outcome with the jury would have been different. Second, the government correctly notes that much of the additional evidence relates to robberies other than the 152nd Street robbery, including counts of which defendant was acquitted and, thus, argues such evidence is irrelevant to the counts of conviction. However, the Court must consider the "prejudicial spillover" effect that these errors had on the jury's decision with respect to the 152nd Street robbery. Under the circumstances of this case, the Court finds that the "prejudicial spillover" effect is extremely high. In its summation, the government often spoke of the robbery crew and the charged robberies together, and emphasized the cross-corroboration between the robberies in an effort to bolster its cooperating witnesses on each individual robbery. The Court concludes that there is not only a reasonable probability, but a high probability that, if the jury had heard this additional evidence

[3] The error during the cross-examination of Martin Lovly regarding an alleged statement he made to the defendant during a court appearance also further damaged the defendant's case. The government made a point during their summation to highlight this mistake and suggest that it bolstered the credibility of Lovly. Thus, although that error alone would not satisfy the *Strickland* prejudice standard, the mistake certainly helped bolster the credibility of Lovly, who adamantly denied making the statement under aggressive cross-examination, and hurt the credibility of the defense as a whole. Thus, the Court has considered this error as part of its analysis as to the cumulative impact of the above-referenced errors on the outcome of the trial.

5

(including the telephone records and information regarding the black sedan), the government's credibility (and its reliance on largely uncorroborated cooperator testimony to sustain its burden) would have been so undermined that the jury would not have been able to reach a guilty verdict on any count beyond a reasonable doubt.[4] Finally, the government argues that there was some corroboration of the cooperators' identifications that has not been impacted by this additional evidence, such as the critical fact that Glass testified that he knew the defendant had a scar from a motorcycle accident, and defendant does have a scar from a motorcycle accident. However, this remaining piece of corroboration is tainted because it is uncontroverted that Glass interacted with other cooperating witnesses in the jail, and there is also evidence that Glass interacted with the defendant in the jail and could have easily learned about the motorcycle accident and scar in the jail, rather than from interactions at the time of the robbery conspiracy.

In sum, the Court emphasizes that it does not conclude that the defendant is factually innocent of the counts of conviction. Instead, the Court concludes that counsel was ineffective under *Strickland* by, *inter alia*, (1) failing to obtain telephone and other records (from school and work) that provided the defendant with the ability to argue to the jury that he was elsewhere at the approximate date and time of the charged robberies; (2) failing to communicate with his client regarding

Government Exhibit 7, which would have allowed defense counsel to completely undermine the government's contention that he used the black sedan referenced in Exhibit 7 to commit the 99th Street and St. Johns Place robberies; (3) entering a stipulation that contained positive identifications of the defendant by two individuals who did not testify at the trial at all; and (4) engaging in an erroneous line of cross-examination during the testimony of cooperating witness Martin Lovly that helped the credibility of that witness, and the government's case, in a substantial way. Moreover, having presided over the trial and having observed the substantial weaknesses in the government's case, the Court concludes that there is a reasonable probability that, but for these errors, the jury would not have convicted the defendant on any counts. The Court does not overturn a jury's verdict lightly; however, the Court is firmly convinced that the circumstances of this case require it. Accordingly, the motion for a new trial based upon ineffective assistance of counsel is granted.[5]

---

[4] Thus, the Court notes that, even if the 152nd Street robbery did not take place on January 13 and the defendant had no telephone records to address his whereabouts the day of the robbery, the Court still concludes without hesitation that the other errors had sufficient "spillover effect" on the jury's decision to credit cooperator testimony on the 152nd Street robbery so as to satisfy the *Strickland* prejudice standard as to all the counts of conviction.

[5] Defendant also has raised several other grounds in support of his ineffective assistance claim. First, defendant contends that trial counsel failed to meet, review evidence or discuss strategy with the defendant. Specifically, defendant claims: (1) in the 15 months from defendant's arrest until his trial, trial counsel only met the defendant three times in settings where they discussed the substance of the case; (2) defendant had no telephone contact with trial counsel; and (3) defendant was not given a copy of the Rule 16 discovery, the 3500 material, or the trial exhibits. Trial counsel testified regarding these and other allegations regarding his representation. Certain aspects of his testimony are disputed by the defendant. For example, trial counsel testified that he did not provide the defendant with Rule 16 discovery, 3500 material, or the trial exhibits because the defendant's brother did not want the documents being sent to the defendant in jail, and thus, with defendant's consent, these materials were provided to the defendant's brother to share with the defendant. The defendant and his brother dispute that they requested this arrangement. However, the Court need

6

## I. BACKGROUND

### A. Evidence Introduced at Trial

At trial, the government introduced evidence of defendant's participation in a conspiracy to rob drug dealers and business owners in New York City, Long Island, and New Jersey. Glass testified that he, defendant, and others committed the following crimes in 2008 and 2009: theft of clothing from a warehouse in New Jersey in late 2008 (*see* Trial Transcript ("Trial Tr.") at 423-42); armed robbery of marijuana dealer Christian Olic ("Olic") at 152nd Street in Queens, New York in January 2009 (*see id.* at 442-62); armed robbery of a medical office on 188th Street in Queens, New York at the end of January 2009 (the "Advanced Dermatology" robbery (*see id.* at 464-73); theft of power tools and a pickup truck in Queens in February 2009 (*see id.* at 473-76); armed burglary of an apartment in Hoboken, New Jersey sometime in 2009 (*see id.* at 476-80); and armed robbery of the Glen Oaks Bar in Queens, New York in March 2009 (*see id.* at 480-88). Lovly, also a participant in the 152nd Street robbery, also testified that defendant was involved in that robbery. (*See id.* at 231-43.) Athanasios Michaelides ("Michaelides"), another co-conspirator, testified that he observed defendant with Glass shortly after the 152nd Street robbery (*see id.* at 966-67), and that he saw defendant unloading the truck full of stolen clothing when Glass and his crew returned to Queens after breaking into the New Jersey warehouse in late 2008 (*see id.* at 971-72). Co-conspirator Kermit Odums ("Odums") also testified that he, defendant, and others committed an additional armed robbery of individuals at 99th Street in Queens in November 2009 (*see id.* at 853-86), and that he, defendant, and others participated in the burglary of an apartment in Brooklyn later that day (*see id.* at 886-92).

The jury also heard evidence concerning the division of the proceeds of these crimes. Glass testified that his crew, including defendant and Lovly, stole approximately two pounds of marijuana from Olic at the 152nd Street robbery. (*See id.* at 461-62.) Glass sold the marijuana to Michaelides for approximately $4000, and then Glass paid each participant in the 152nd Street robbery, including defendant, a portion of that money. (*See id.* at 462.) Glass also testified that, following his theft of power tools and a pickup truck in Queens in February 2009, he sold the power tools for cash, and then divided the cash among his crew (including defendant). (*See id.* at 474-76.)

### B. Procedural Background

Following the presentation of the government's case-in-chief, defendant moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(a). (*See id.* at 1059.) The Court denied the motion as to Counts One through Seven, stating that "there is no question that there is sufficient proof with respect to each and every element of these, counts one through seven." (*Id.* at 1059-60.) Pursuant to Rule 29(b), the Court reserved judgment as to Count Eight, the money laundering conspiracy count. (*Id.*)

The Court submitted all eight counts of the superseding indictment to the jury. On May 1, 2014, the jury returned a verdict of guilty as to Count One (Hobbs Act robbery

---

not resolve the factual disputes regarding these issues or any other disputed aspects of the representation because the Court concludes that the above-referenced errors (discussed in further detail below) are sufficient to satisfy the *Strickland* standard. Similarly, the Court need not address defendant's motion for a new trial based upon newly discovered evidence (such as the telephone records and other evidence) because it has granted the motion on other grounds – namely, ineffective assistance of counsel.

conspiracy from April 2008 through April 2010), Count Three (robbery of Olic at 152nd Street in Queens), Count Four (brandishing a firearm during the 152nd Street robbery), Count Seven (conspiracy to distribute marijuana), and Count Eight (conspiracy to commit promotion money laundering). The jury acquitted defendant as to Count Two (the theft of clothing from the New Jersey warehouse), Count Five (the robbery of the medical office in Queens), and Count Six (the firearm charge premised upon Count Five).

Defendant renewed his motion for a judgment of acquittal as to Count Eight on June 9, 2014, which the Court denied in an October 27, 2014 Memorandum and Order.

On August 3, 2015, defendant filed a motion for a new trial under Rule 33 of the Federal Rules of Civil Procedure. On October 26, 2015, the government filed its opposition. After oral argument on November 6, 2015, the Court determined that an evidentiary hearing was necessary to hear testimony from trial counsel (and any other relevant witnesses) regarding the allegations of ineffective assistance of counsel. The Court held an evidentiary hearing over several days: March 31, 2016, and April 20-22, 2016. There was a substantial delay in the scheduling of the hearing because trial counsel, who was a critical witness at the hearing, was unavailable for a substantial period of time due to significant medical issues. After the hearing, defendant's new counsel asked for several weeks to prepare for post-hearing argument. Thus, the post-hearing argument was heard on June 8, 2016. On June 17, 2016, the government submitted an additional letter in response to issues raised by the Court at the post-hearing argument. On June 20, 2016, defendant submitted a

letter in response to the government's submission.[6]

C. Evidentiary Hearing

Set forth below is a summary of the testimony at the evidentiary hearing that the Court conducted in connection with defendant's motion for a new trial based upon ineffective assistance of trial counsel.

1. Detective Holmes

Detective Edwin Holmes testified on March 31, 2016, and April 20, 2016. Detective Holmes worked for 34 years with the Nassau County Police Department, and is currently an investigator with the Nassau County District Attorney's Office. (Tr. at 4.)[7] Detective Holmes was the case agent and one of the central investigators on the case, though he did not testify at trial. (*Id.* at 5.) Detective Holmes interviewed all of the cooperators who testified at the defendant's trial, including Glass, Lovly, Odoms, and Michalides, as well as cooperators who did not testify at trial, such as Terry Bedell and Gerry Machacek. (*Id.* at 5-6.) Detective Holmes testified that both Bedell and Machacek failed to positively identify the defendant as a perpetrator in the robberies. (*Id.* at 6.) Detective Holmes also testified that he helped prepare the cooperators for their testimony at trial. (*Id.*)

Detective Holmes testified that he believed that he was present for all of the identifications by the informant witnesses in this case. (*Id.* at 190.) Detective Holmes

<hr />

[6] Although the defendant objects to the government's submission because it did not seek permission from the Court, the Court in its discretion has considered both the government's June 19 submission and the defendant's response.

[7] "Tr." refers to citations to the transcript of the evidentiary hearing, and "Ex." refers to exhibits admitted during the evidentiary hearing.

affirmed his prior testimony from the April 7, 2014 evidentiary hearing that his technique for identifications was "that if I show a photo pack to anyone and they identify no one, I still keep it as a piece of evidence. I'll write no ID or no identification. I'll still have the individual who viewed it, sign it, time it, and date it, and make an exhibit of it in case, even though it was not identified," and that this was his technique in the defendant's case. (*Id.* at 210; *see also* Apr. 7, 2014 Hrg. Tr. at 15-16.) Detective Holmes further testified that, when a witness indicates that he recognizes someone from the photo pack, "I normally have the individual circle the photographs and put his initials in the photograph as well as I will. And I will have him time and date the photograph, usually right within the circle or within that area. And I normally have him, on the bottom he will sign his name in full, as I would. And another law enforcement officer [who] was present and observed the identification process[, h]e will." (Tr. at 210; *see also* Apr. 7, 2014 Hrg. Tr. at 16.)

Detective Holmes testified that, when Glass first positively identified the defendant in a photo array on October 5, 2012, he noted the positive identification in his notes and circled the defendant's picture on the photo array. (Tr. at 211-12.) Detective Holmes indicated on the photo array that Glass referred to the individual in the array as "known to me as 'Rob,' he did robberies with me" and as a "friend of Jerry and Alex." (*Id.* at 212; Def. Ex. 275.) Detective Holmes further testified that, on December 18, 2012, the defendant was identified as "Rob." (*Id.* at 213-14; *see also* Def. Ex. 208.) Detective Holmes testified that, on April 30, 2013, Glass identified the defendant in a second photo array, which contained a different picture of the defendant, which was taken after he was arrested on January 29, 2013. (Tr. at 215;

*see also* Def. Ex. 280-81.) Detective Holmes stated that the April 30 photo array was done "[w]ith the assistance of the defense attorney" and that Mr. Jenks "wanted another photo pack done" because he believed that the defendant was not the individual identified in the first photo array. (Tr. at 218.) Detective Holmes testified that he circled the fifth image on the photo pack, wrote the date and time on the image, signed it, and had Glass initial it. (Tr. at 219; *see also* Def. Ex. 281.) Detective Holmes also testified that an arrow was drawn to the defendant's picture, which was also in the photo array, and that Glass identified both men at the same time. (Tr. at 220; *see also* Def. Ex. 281.) Detective Holmes confirmed that there was nothing in his notes regarding the photo pack shown to Glass on April 30, 2013, and indicated that the photo pack speaks for itself. (Tr. at 222.) Detective Holmes's April 30, 2013 notes included details about "Rob" and indicated that, according to Glass, "Rob" had a scar on his hand from a dog bite and a scar on his leg from a motorcycle accident, and both "Rob" and his cousin had pit bulls. (*Id.* at 223-24; *see also* Def. Ex. 212.) Detective Holmes confirmed that the description of "Rob" having dog bites and a motorcycle scar prompted the government to take pictures of the defendant. (Tr. at 230.) Detective Holmes testified that he believes that Glass learned that the defendant's name was Adam Velazquez when Glass saw him at MDC Brooklyn ("MDC") when the defendant refused to be produced for photographs. (*Id.* at 245-46.)

Detective Holmes then testified regarding Lovly's identification of the defendant. Detective Holmes confirmed that, at the government's October 2, 2013 interview with Lovly, Lovly indicated that he met the individuals he knew as "Rob" and "Alex" through Glass and that they were at the marijuana robbery in Whitestone. (*Id.*

at 238; Def. Ex. 258.) Lovly "described them as being dark skinned Dominicans with thin builds. He just referred to them as the 'black kids.'" (Tr. at 238; Def. Ex. 258.) Detective Holmes testified that, when Lovly was shown the photo pack, he identified the second image, which was a picture of the defendant, and the image was circled. (Tr. at 238-40; *see also* Def. Ex. 261.) Detective Holmes wrote on the photo pack that there was "no ID positively for the home invasion" but that Lovly "also saw this guy at Ralphie's barber shop while [he] was looking for Timothy Glass. [He] saw him at Ralphie's shop after the robbery looking to buy drugs from Glass." (Def. Ex. 261; *see also* Tr. 240-42.) Detective Holmes further testified that he met with Lovly again on October 10, 2013, at which point Lovly indicated that, after thinking about it for a week, he was "positive about the identification from the previous meeting" and said that he was "100 percent sure" that the individual identified in the October 2 photo pack was "the guy that did the robbery with [him.]" (Tr. at 243-44; *see also* Def. Ex. 262.) Lovly was not shown another photo pack on October 10, 2013. (Tr. at 243.)

With respect to cooperating witness Odoms, Detective Holmes testified that the New York City Police Department ("NYPD") conducted the photo array on May 27, 2010, in which Odoms identified the defendant by a photo of him as a teenager. (Tr. at 247.) Detective Holmes confirmed that he did not do a subsequent photo array with Odoms. (*Id.* at 248.) Detective Holmes testified that the NYPD had a separate and independent investigation into the defendant, which is how this initial photo pack with the defendant in it came to be made. (*Id.* at 252.) Detective Holmes testified that Anthony Stravello, a government source, provided information to the Nassau County Police Department in

2013, which he had previously provided to the NYPD "years earlier." (*Id.* at 254-55.)[8]

2. Edward Jenks

Trial counsel Edward Jenks testified on March 31, 2016. Mr. Jenks was appointed to represent defendant on January 29, 2013. (Tr. at 16.)

Mr. Jenks testified that, over the course of his representation, he never had any telephone communications with the defendant, though he spoke "many, many" times with defendant's brother, Scott Velazquez, approximately "three or more times a week throughout the duration of the case." (*Id.* at 30.) Mr. Jenks also testified that, as it "got closer to trial," in March and April 2014, defendant's mother, Marilyn, called the office several times. (*Id.* at 32.) Mr. Jenks testified that Scott Velazquez requested that he be provided with all the paperwork in the case and that paperwork not be sent to defendant, and that, accordingly, he did not send any documents to the jail except for defendant's plea agreement in February 2014. (*Id.* at 38-41.) Mr. Jenks testified that the defendant never objected to this arrangement. (*Id.* at 124.)

Mr. Jenks testified that he met the defendant in the pens in the Central Islip courthouse before or after his appearances, and that the U.S. Marshal's Service also produced the defendant for private meetings at the courthouse on at least four different occasions, but "maybe more." (*Id.* at 42-45, 109-110, 112-13.) Mr. Jenks testified that he reviewed the particular charges and salient portions of the indictment with the defendant. (*Id.* at 110-11.) Mr. Jenks testified that Scott Velazquez "may have asked [him] once" to visit the defendant, but that he didn't recall. (*Id.* at 35.)

---

[8] The hearing transcript incorrectly refers to the name as "Anthony Cervello."

Mr. Jenks testified that, when he discussed his case with the defendant, he "really had nothing to say except I don't know these people. I didn't do this, and I'm innocent." (*Id.* at 44; *see also id.* at 60.) Mr. Jenks further testified that, when he explained to plaintiff about the New Jersey warehouse burglary charge in the indictment, plaintiff told him that he had never been to New Jersey in his life. (*Id.* at 45; *see also* Jenks Decl. ¶ 9.)

Mr. Jenks acknowledged that plaintiff asked him to get cell phone records, but said that he told plaintiff that "they're basically worthless, the cell phone records, because the cooperators in this case are going to testify that all the defendants used burner phones." (Tr. at 47; *see also id.* at 53 ("Detective Holmes had discussions with Mr. Ryan, and the issue of burner phones came up and they told me that nobody used their cell phones.").) Mr. Jenks further testified that he initially told plaintiff that he was going to subpoena the phone records, but he then changed his mind and determined that "cell phone records are meaningless" because "[a]nybody can have your cell phone." (*Id.* at 48.) Mr. Jenks testified that he communicated his decision not to obtain the phone records to the defendant and told him that the plan was to try the case "on reasonable doubt." (*Id.* at 116-117; *see also* Jenks Decl. at ¶ 21.)

Mr. Jenks acknowledged that, by September 5, 2013, he knew the dates on which the crimes allegedly occurred for the substantive counts and for at least one of the counts in the conspiracy, though the dates given by the government were changing until one week before the trial started. (Tr. at 51-52, 64-65.) Mr. Jenks testified that he told the defendant of the dates verbally and also explained the dates to Scott Velazquez. (*Id.* at 62.) Mr. Jenks also testified that he told the defendant that, because many of the robberies were not reported to law enforcement, it was unlikely they would learn the exact dates of the robberies. (*Id.* at 67; *see also* Jenks Decl. ¶ 14.) Mr. Jenks further testified that the defendant told him that he wanted to take a polygraph, which Mr. Jenks told him would not show anything, as well as be put in a lineup, which Mr. Jenks asked to be done. (Tr. at 66.)[9]

Mr. Jenks testified that he did not provide the defendant with, or review with him, the 3500 material or the exhibits for the trial before the trial began. (Tr. at 85, 89-90.) Instead, Mr. Jenks testified that he "told [the defendant] basically what was in [the 3500 material]." (*Id.* at 89.) Mr. Jenks also testified that, prior to the trial, he had meeting with Scott Velazquez, which lasted approximately an hour or an hour and a half, regarding the exhibits and 3500 material prior to the trial, which Scott Velazquez indicated he would tell his brother about when he saw him. (*Id.* at 114.)

Mr. Jenks testified that, during the trial, the government repeatedly tried to connect a black, four-door sedan to the defendant. (*Id.* at 85.) Mr. Jenks further testified that, when they heard this testimony, both the defendant and Scott Velazquez told him that the defendant did not have a black sedan in 2009, and then tried to get Mr. Jenks information about this during the trial. (*Id.* at 86.) Mr. Jenks also testified that he "attempted to speak to Detective Holmes about the car being destroyed and plates surrendered, and Detective Holmes told [him] there's no New York State DMV abstract record of the car being destroyed, totaled, salvaged or plates surrendered." (*Id.*) Mr. Jenks acknowledged that a DMV

---

[9] Mr. Jenks indicated in his declaration that he "felt that putting Velazquez in a line-up was a poor idea because witnesses had already identified him from photo arrays." (Jenks Decl. ¶ 45.)

motor vehicle printout, admitted into evidence at trial, indicated that the defendant surrendered his car's plates on June 30, 2008. (*Id* at 87; *see also* Gov. Ex. 7.) Mr. Jenks testified that the defendant "never mentioned a crashed black sedan to [him] in 2008, despite his being told that at the reverse proffer. He mentioned it for the first time at the trial." (Tr. at 81; *see also* Jenks Decl. ¶ 48.) However, Mr. Jenks acknowledged that, if the defendant had been shown the trial exhibits before trial, the defendant could have informed him that he did not have the car in 2009. (Tr. at 88-89.)

Mr. Jenks testified that he did not speak with the defendant about whether he spoke Spanish or try to get in evidence that he did not speak Spanish. (*Id*. at 80, 89.) Mr. Jenks also acknowledged that, in the 3500 material, Glass repeatedly indicated that the defendant had scars from a motorcycle accident as well as from a dog bite, (*id*. at 90), and that Glass testified at the trial that he knew that the defendant had scars on his face from a motorcycle accident. (*Id*. at 94.) Mr. Jenks testified that, when this testimony about defendant's scars came out at trial and the government introduced photographs of the defendant's scars, there was no discussion with either the defendant or his family about putting in evidence of childhood photographs to rebut Glass's testimony. (*Id*. at 102-03.)

Mr. Jenks testified that, prior to trial, Alex Ponze introduced himself as a friend of the defendant and offered his help with the trial, which Mr. Jenks accepted. (*Id*. at 72.) Mr. Jenks testified that he encouraged Mr. Ponze to talk to the defendant and also gave him an "assignment" during the trial to keep track of inconsistent statements made by the cooperators. (*Id*. at 72-73.)

Mr. Jenks testified that, when the Glen Oaks robbery was mentioned at trial, the defendant told him that the date of the robbery was his first day of work. (*Id*. at 118.) Mr. Jenks further testified that during the trial, for the first time, Mr. Ponze provided him with a letter from February 2013, which indicated that the defendant was initiated into Local Union 3 IBEW in July 2009 and was employed by participating employer contractors of the Joint Industry Board since March 2, 2009. (*Id*.; Gov. Ex. R.) Mr. Jenks testified that, once he obtained this letter, he asked the defendant who they could contact at IBEW to show that he was working and also directed his associate, John Kahn, to call the Joint Industry Board of Electrical Industry to get another letter as to defendant's time of employment in the union. (Tr. at 120.) Mr. Jenks further testified that they obtained an updated letter concerning defendant's employment and "entered into a stipulation with the government to show that on the date of the Glen Oaks robbery, which occurred allegedly at 2 a.m., Adam was starting work at 8 a.m. on that day in the city." (*Id*. at 121.) Mr. Jenks also testified that he entered into a stipulation with the government "showing the dates [defendant] was working and for what companies." (*Id*. at 122.)

Mr. Jenks testified that he discussed the 99th Street robbery, which occurred on November 23, 2009, with the defendant, and the defendant said that he "didn't do it" but that he did not know where he was on that date. (*Id*. at 121.) Mr. Jenks testified that he did not receive any information that the defendant had any type of an alibi for the robberies discussed at trial and that, if he had been given that information, he would have investigated it. (*Id*. at 122.)

3. Scott Velazquez

Defendant's brother, Scott Velazquez, also testified on March 31, 2016. Mr.

Velazquez is a Detective with the New York City Police Department. (*Id.* at 137.)

Detective Velazquez testified that the defendant obtained the scars on his face from a childhood injury with a swing set, rather than from a motorcycle accident. (*Id.* at 138-40.) Detective Velazquez testified that, when Glass testified about the source of defendant's scars during the trial, he told Mr. Jenks that such testimony was inaccurate and that Mr. Jenks knew that the scar was not from a motorcycle accident. (*Id* at 174-76.) However, Detective Velazquez testified that he never showed childhood photographs of the defendant with a scar on his face to Mr. Jenks during the trial. (*Id* at 177-78.) Detective Velazquez also testified that he had never heard the defendant speak Spanish, even though his wife is from El Salvador, and that the defendant did not speak Spanish at home with his family. (*Id* at 141.)

Detective Velazquez testified that he met Mr. Jenks the day of defendant's arraignment and asked Mr. Jenks for copies of all the paperwork so he could examine them "from an investigative viewpoint" because he and Mr. Jenks agreed that Detective Velazquez might see things "from a different point of view as an investigator." (*Id* at 143.) Detective Velazquez testified that he never told Mr. Jenks not to send paperwork to the defendant or not to review it with the defendant. (*Id.*; *see also id.* at 178-79.) Detective Velazquez stated that he did not understand that he was supposed to be the one to go over the paperwork with the defendant. (*Id.* at 147, 153.) Detective Velazquez testified that he never met with Mr. Jenks about the 3500 material or otherwise discussed the 3500 material with him, nor was he given a copies of the 3500 material. (*Id* at 153.)

Detective Velazquez testified that he told Mr. Jenks on more than one occasion that the defendant wanted to know the dates of the crimes and that Mr. Jenks responded that the dates were "always changing from the government" and "[h]e just didn't have the exact dates." (*Id.* at 148.) Detective Velazquez also stated that Mr. Jenks told his mother that it was not his practice to give his personal telephone number to his clients. (*Id.* at 146.)

Detective Velazquez testified that he told Mr. Jenks that the defendant wanted to see him "on numerous occasions where we talked in person, we talked on the phone, sometimes during texts." (*Id.* at 144.) Detective Velazquez stated that he offered to drive Mr. Jenks to the MDC to visit the defendant on more than one occasion because Mr. Jenks was unable to drive there due to his Parkinson's disease, but that Mr. Jenks never set a date to go. (*Id.* at 150-51.) Detective Velazquez also testified that he spoke with Mr. Jenks about driving him to the bars defendant was alleged to have robbed so that Mr. Jenks could "say he was inside the place and be able to understand what they were talking about" but that Mr. Jenks never followed up and requested to be driven to the bars. (*Id.* at 163.)

Detective Velazquez testified that, on April 29, 2014, Mr. Jenks asked him to request the defendant's work records to use as alibi evidence because they learned of the date of a crime for the first time during the trial. (*Id.* at 154-55.) Detective Velazquez stated that he did not know what records were sent because they went to Mr. Jenks, but that they were not entered into evidence. (*Id.* at 155.) However, Detective Velazquez acknowledged that the stipulation about defendant's employment with the union was entered into evidence and he did not have anything else that he wished to be put into

evidence by Mr. Jenks that was left out. (*Id.* at 173-74.)

Detective Velazquez testified that his family learned about the government connecting a black Impala to defendant for the first time during the trial. (*Id.* at 160, 163.) However, Detective Velazquez indicated on cross-examination that he stated in his November 4, 2015 affidavit that he spoke with Mr. Jenks "about the fact that the black sedan had been wrecked and junked, first after the reverse proffer, which occurred in April 2013." (*Id.* at 164-65; *see also* Scott Velazquez Decl. ¶ 9.) Detective Velazquez indicated that, during the trial, his family was looking for insurance paperwork and the accident report to show when the car was destroyed and the insurance and plates were surrendered in order to prove that defendant's car had been destroyed before 2009. (Tr. at 160-61.) Detective Velazquez stated that his family was ultimately able to obtain the insurance proof, but not the accident report because the DMV does not keep accident reports for more than four years. (*Id.* at 161.) Detective Velazquez testified that, during the trial, the only thing they had to prove the 2008 accident was photographs, which they showed Mr. Jenks during the trial; however, according to Detective Velazquez, Mr. Jenks told him that "it was too late." (*Id.* at 162.)

Detective Velazquez stated that Mr. Jenks changed his position on phone records after the trial and, one month after the trial was over, tried to obtain the phone records. (*Id.* at 156-57.) Detective Velazquez testified that he texted a Verizon address and Adam's phone number to Mr. Jenks in June 2014 so that Mr. Jenks could obtain the phone records. (*Id.*; *see also* Def. Ex. 41 at line 113.)

### 4. Manuel Lopez

Manuel Lopez, an electrician with Local Union Number 3, also testified on March 31, 2016. Mr. Lopez testified that the defendant worked under his command for the Roosevelt Hospital project and that the defendant's first day on the job was the first day of the project. (*Id.* at 180-81.) Mr. Lopez stated that the defendant never called in sick or arrived late, and that he could not remember specifically if the defendant was late on his first day but "doubt[ed] it" because he fires people or brings them up on charges with the union for being repeatedly late and it would "stand out in [his] mind" if someone was late on the first day because "[i]t would hold [him] up from getting the other dozen or so guys started" due to the paperwork done on the first day. (*Id.* at 182-83.) Mr. Lopez also stated that the defendant told him that he had been hospitalized due to motorcycle accidents and showed him the scar on his chest caused by the accidents. (*Id.* at 184.)

### 5. Alex Ponze

Alex Ponze testified on April 20 and 21, 2016. He testified that he and the defendant were "acquaintances"[10] and that he became involved in the case after running into the defendant's wife, Marcella, at a restaurant in October 2013. (*Id.* at 257; *see also id.* at 295.) Mr. Ponze testified that Marcella told him that the defendant had been arrested and asked if she could pass his phone number along to defendant's mother because she remembered that Ponze was an attorney.

---

[10] Mr. Ponze testified that, although he was introduced to the Court at trial as a "family friend," that description was not accurate, but he "was standing in the back of the gallery" and "wasn't going to correct Mr. Jenks as he said that." (Tr. at 298-99.) Mr. Ponze testified that they met approximately ten years ago through a mutual friend and he had seen the defendant "maybe 20 times" prior to the fall of 2013. (*Id.* at 296-97.)

(*Id.* at 257-58.) Mr. Ponze testified that the defendant's mother, Marilyn Velazquez, started calling him the Monday after he gave Marcella his number and continued to contact him "three or four times a week for a couple of weeks." (*Id.* at 258-59.) Mr. Ponze stated that he did not respond to Mrs. Velazquez's phone calls immediately because he "was working in Brooklyn at the time, and [] didn't know anything about federal criminal law, and [] just didn't want to be a part of it." (*Id.* at 258.) Mr. Ponze stated that, ultimately, he "randomly picked up the phone" when Mrs. Velazquez called and, although he told her that he did not want to get involved, he asked her a few questions and thereafter, "stayed in contact with her about the case here and there." (*Id.* at 259.) Mr. Ponze testified that, in December 2013, about a month after he started speaking to Mrs. Velazquez about the case, she asked him if he would be willing to set up a Corrlinks account to communicate with the defendant at the jail. (*Id.* at 259-60.) Mr. Ponze testified that initially he just had "casual" communication with the defendant, "nothing related to legal representation" and that he "really had very little contact" with the defendant and Mrs. Velazquez until March 2013. (*Id.* at 260-61.)[11]

Mr. Ponze testified that, in the middle of March 2014, he was switching jobs and had a two-week period in which he was not working. (*Id.* at 261.) Mr. Ponze testified that he told Mrs. Velazquez this, and she asked if he would be willing to come to a status hearing for the defendant on March 25, 2014, and contact Mr. Jenks. (*Id.*) Mr. Ponze testified that he called and left a message for Mr. Jenks on March 21, to introduce himself, and came to the status hearing on March 25. (*Id.*) Mr. Ponze testified that he observed the status conference from the gallery and introduced himself to Mr. Jenks at the end. (*Id.* at 265.) Mr. Ponze testified that Mr. Jenks asked him if he was admitted in the Eastern District and whether he had a secure pass; when he confirmed that he did, Mr. Jenks asked him to go down to the U.S. Marshal's pens and talk with the defendant. (*Id.*) Mr. Ponze testified that he went down to the pens without Mr. Jenks and spoke with the defendant for about 30 minutes. (*Id.*) Mr. Ponze testified that he took notes during the meeting, which he e-mailed to Mr. Jenks the next day. (*Id.* at 265-66; *see also* Def. Ex. 135.) Mr. Ponze testified that the defendant wanted to convey to Mr. Jenks that he was "scared and confused. He didn't really seem to know what he was being charged with, how he was identified. He insisted that he didn't know any of the co-conspirators on the case" and wanted to know if the Court was "aware of all of these inconsistencies in terms of the identification and just general lack of evidence against him." (Tr. at 269.) Mr. Ponze testified that the defendant wanted to investigate an alibi defense and specifically look into his cell phone records. (*Id.* at 269-70; *see also* Def. Ex. 135.)

Mr. Ponze testified that he visited the defendant for approximately three hours at the MDC on April 4, 2014, and thereafter, sent notes from the meeting to Mr. Jenks. (Tr. at 272; *see also* Def. Ex. 108-114.) Mr. Ponze testified that the defendant "want[ed] a copy of the 3500 material immediately", "want[ed] to familiarize himself with everything so he has an idea of where the case is going," and "want[ed] to know what is being done on his behalf and what steps are being taken to prove his innocence," including obtaining phone records and taking a lie detector test. (Tr. at 274-75; *see also* Def. Ex. 109.) Mr. Ponze also testified

---

[11] Mr. Ponze testified that he met with Scott Velazquez "[m]aybe two or three times" prior to the trial and once during the trial to pick up a copy of the transcript to bring to MDC. (*Id.* at 334.)

that the defendant provided his phone number and e-mail addresses so that they could be subpoenaed, which Ponze then provided to Mr. Jenks. (Tr. at 276; *see also* Def. Ex. 110.) Mr. Ponze testified that the defendant told him that he did not know the dates of the crimes he was alleged to have committed and wanted to know whether "the numerous discrepancies concerning his identification" would be presented to the Court, including the "erroneous assumption" that he has a dog bite on his hand and a tattoo by his foot and the "outdated and possibly doctored photograph used to identify" him. (*Id.* at 277-78; Def. Ex. 110-11.) Mr. Ponze also testified that the defendant wanted to know who would be called as defense witnesses at trial, what evidence would be presented on his behalf, how he could prepare, and what the strategy was. (Tr. at 279; Def. Ex. 111.)[12]

Mr. Ponze testified that he never received 3500 material or any discovery either before or during the trial, nor did he review any 3500 material with the defendant. (Tr. at 294.) Mr. Ponze further testified that he was not involved in any aspect of trial preparation and was not present for the last three days of trial. (*Id.* at 294-95.)

Mr. Ponze testified that on, April 24, he told Mr. Jenks that he thought that "Adam must testify," to which Mr. Jenks responded "Adam can testify. His testimony will be short. His cross risky. They will bring Stravello on marijuana and Adam dealing. They still have two more informants: Odoms and Sacci." (Tr. at 305; *see also* Gov. Ex. L.) Mr. Ponze further testified that, although he originally told Mr. Jenks that the defendant "must testify" on April 24, on April 26, he told Mr. Jenks that "Adam does not think it is necessary to testify," and Mr. Jenks agreed that it was "smart Adam not testify." (Tr. at 306; *see also* Gov. Ex. L.)

Mr. Ponze testified that on April 25, 2014, in the middle of the trial, he sent Mr. Jenks an e-mail regarding Machacek's plea, which he felt was contradictory to Glass's testimony at trial and could be exculpatory because (1) Machachek stated in his plea allocution that he stood watch outside and the eyewitness stated that only one gunman entered the doctor's office, whereas Glass testified at trial that both Machcek and the defendant went into the doctor's office, and (2) the eyewitness to the robbery described the gunman as 5'3'' and 150 lbs., whereas

---

[12] Although Mr. Ponze testified that he sent e-mails to Mr. Jenks on March 26, 2014, and April 4, 2014, Mr. Jenks testified that he never received them. (Tr. at 69-71.) These two e-mails were sent from Mr. Ponze's hushmail.com account, whereas Ponze's other e-mails to Mr. Jenks were sent from Ponze's gmail.com account. (*Id.* at 316-17.) The format of the hushmail e-mails differs from that of the gmail messages Mr. Ponze sent Mr. Jenks and does not include a "from" line. (*Id.* at 319-20; Def. Ex. 135-36, 108-114.) Mr. Ponze testified that he forwarded the hushmail messages that he sent to Mr. Jenks to his gmail account and ultimately forwarded them to Ms. Laser to use in the case. (Tr. at 320.) Mr. Ponze testified that he called Mr. Jenks to tell him that he sent the March 26 e-mail with notes of his discussions with the defendant, but did not recall whether he discussed sending the April 4 e-mail. (*Id.* at 320-21.) Mr. Ponze also testified that, when he spoke with Mr. Jenks on March 26, he told Mr. Jenks that he would be memorializing his notes with the defendant in an e-mail. (*Id.* at 332.) Mr. Ponze could not remember whether Mr. Jenks acknowledged the e-mails. (*Id.* at 321.) Mr. Ponze testified that he began sending e-mails to Mr. Jenks from his gmail account, instead of his hushmail account, because it was inconvenient to use the hushmail account. (*Id.* at 332.) Mr. Ponze testified that he had used hushmail "a couple of times before" sending the e-mails to Mr.

Jenks and had "never heard any complaints" about it. (*Id.* at 332-33.) Ms. Moses, Mr. Jenks's office manager, testified that she conducted a search of the office computer system to identify each e-mail sent between Mr. Ponze and Mr. Jenks, and that the first e-mail from Mr. Ponze was sent on April 18, 2014, and came from his gmail account. (*Id.* at 492-94.)

the defendant is 5'11'' and 170 lbs. (Tr. at 280-82; *see also* Def. Ex. 137.) Mr. Ponze testified that Mr. Jenks brought this information to the Court's attention, and on April 30, the parties stipulated to the Machacek plea. (Tr. at 283.)

Mr. Ponze testified that he never discussed the black car with the defendant, and that he was not at trial for the final two days when the government was trying to link the car to the defendant. (Tr. at 321-22.) Mr. Ponze testified that he was present when the issue of the defendant's facial scars came up at the trial and remembered the defendant's family saying that the facial scars were not from a motorcycle accident. (*Id.* at 323.) Mr. Ponze testified that he remembered "bringing it up to Mr. Jenks, because it seemed like he didn't know that that stuff was going to come into evidence" and that he did not think that Mr. Jenks knew that the defendant had been in two different motorcycle accidents. (*Id.*) However, Mr. Ponze testified that he was not a part of any discussions regarding childhood photographs of the defendant with his scar. (*Id.* at 323-24.)

Mr. Ponze also testified as to his cell phone records, which he obtained from Verizon, and summarized his calls with Mr. Jenks, including that Mr. Jenks first returned his call on March 24, 2014, that he had a seven minute phone call with Mr. Jenks on March 26, after visiting the defendant for the first time, and that on April 24 and 25, he spoke with Mr. Jenks regarding delivering the trial transcripts to the defendant at the MDC and his April 25 visit with the defendant. (Tr. at 284-89; *see also* Def. Exs. 446-71.)

Mr. Ponze confirmed that, during the trial, in his e-mails to Mr. Jenks, he told him that "I'm with you 100 percent." (Tr. at 303; *see also* Gov. Ex. L.) Mr. Ponze

testified that, after the trial was over, on May 9, in an e-mail regarding filing a Rule 29 motion, he told Mr. Jenks "As I've said repeatedly, the outcome of this case was not indicative of your performance during trial. You did a fine job and going into summation I was confident that we would prevail." (Tr. at 310-11; *see also* Gov. Ex. L.) Mr. Ponze confirmed that he told Mr. Jenks that he was doing a "fine job" throughout the trial and that Mr. Jenks promptly responded to the various e-mails Ponze sent him throughout the trial. (Tr. at 316.) Mr. Ponze testified that, when he sent these e-mails, he was not aware whether Mr. Jenks had done any investigation into possible alibi evidence. (*Id.* at 330.)

Mr. Ponze testified that he sent an e-mail to Mr. Jenks on May 5, 2014, four days after the trial ended, to relay questions from the defendant, including "[w]hat exactly he was charged with," "what did the jury find him guilty of," "[w]hat did the jury not guilty of," and "when will he be able to review the transcript and the discovery materials so he can prepare his appeal." (*Id.* at 328-29; *see also* Gov. Ex. L.)

6. Adam Velazquez

The defendant testified on April 21 and 22, 2016.

The defendant stated that he started his electrical work in 2006/2007 for a private company and then joined his union on March 2, 2009. (Tr. at 339.) The defendant testified that the electrical union required him to attend work daily, take an electrical theory course after work once a week, and attend college throughout his apprenticeship. (*Id.* at 340.) The defendant stated that he attended work every day starting March 2, 2009, and began taking college courses at Empire State College in September 2009. (*Id.* at 340.)

The defendant was arrested at his home on January 29, 2013, as he was getting ready to leave for work. (*Id.* at 341.) Mr. Jenks was appointed to represent the defendant the same day, and the defendant testified that they met "very brief[ly]" in the courtroom where Mr. Jenks "read a little bit of the indictment" to the defendant and told him that he would need to enter a plea. (*Id.* at 342.) The defendant stated that Mr. Jenks never provided him a copy of the indictment either on January 29, or on a later date. (*Id.*) However, the defendant acknowledged that, when asked by the Court on January 29, whether he saw a copy of the superseding indictment and had sufficient time to review it with his attorney, he said yes. (*Id.* at 431-32.) The defendant testified that he saw Mr. Jenks again two days later, on January 31, 2013, for a status conference. (*Id.* at 343.) The defendant testified that he "was hoping to get a chance to speak with him more" but that, after the status conference, Mr. Jenks sent him downstairs with the prosecutor, Burton Ryan, to give his pedigree information, which made the defendant "a little uncomfortable that [Mr. Jenks] wasn't coming downstairs with [him]." (*Id.*)

The defendant described "that it seemed like forever, waiting for [Mr. Jenks] to come visit." (*Id.* at 344.) The defendant testified that, after the January status conference, they had a February visit, which he did not initially remember, and then an April visit. (*Id.* at 344-45.) The defendant stated that in the interim, he tried to contact Mr. Jenks through his family because a Global Tel Link account was necessary in order to make calls from the Nassau County Correctional Center ("NCCC"), where he was housed. (*Id.* at 345.) The defendant stated that his family put money in the Global Tel Link account so that he could call them, but that Mr. Jenks did not. (*Id.*) The defendant testified that he "never agreed" for his brother, Scott, to serve as a

conduit for communications with Mr. Jenks and "absolutely" expected that he would personally be able to speak with Mr. Jenks. (*Id.* at 345.)

The defendant did not remember Mr. Jenks bringing the S4 indictment with him when he visited in February, but believes that he did bring it in April; however, the defendant testified that he did not get a copy of the indictment and stated "by the time [Mr. Jenks] left, I didn't leave with a full understanding of what it was that I was being held for or why I was being charged." (*Id.* at 346.) The defendant testified that he and Mr. Jenks also discussed the New Jersey warehouse robbery at the April 2013 visit, and that Mr. Jenks showed him the photo array that was used to indict him. (*Id.* at 347.) The defendant testified that because the photo array was a "really bad copy," he "couldn't make out what the picture was" and told Mr. Jenks that he "didn't believe it was me." (*Id.*) The defendant told Mr. Jenks that, although the photo array said "known to me as Rob," he never went by the name of Rob, and also expressed that he was innocent and could not have been in New Jersey because he had never been to New Jersey. (*Id.* at 347-48.) The defendant also testified that he asked Mr. Jenks to look into "phone records or work records or anything that could show that I was not there," and stated that Mr. Jenks told him that looking into phone records would be a good idea and that he would do it. (*Id.* at 348.)

The defendant attended a reverse proffer with Mr. Jenks, Mr. Ryan, and Detective Holmes on April 24, 2013. (Tr. at 348-49.) The defendant testified that Mr. Jenks told him before the meeting to "just listen, and if I had any questions, that I should ask for Mr. Ryan and Mr. Holmes to leave the room so that I could ask a question." (*Id.* at 349.) The defendant stated that he remembered Mr. Jenks asking if there was any hard

evidence, fingerprints, DNA, or anything concerning phone records, and that Detective Holmes told him that there was nothing in the records that connected the defendant to the witnesses. (*Id.*) The defendant also testified that, after the meeting was over, he asked Mr. Jenks to look into his phone records and Mr. Jenks agreed that he would do so. (*Id.* at 350.) The defendant testified that, after the reverse proffer, he had no further contact or visit with Mr. Jenks while he was incarcerated at the NCCC. (*Id.*)

The defendant stated that he never personally spoke to Mr. Jenks about a bail hearing, but he reached out to his family "constantly" to ask for a bail hearing throughout the time he was incarcerated at the NCCC. (*Id.*) The defendant testified that he never saw the government's March 15, 2013 letter, which argued that he should not be released on bail, and that he did not meet with Mr. Jenks prior to the July 31, 2013 bail hearing to discuss arguments for the hearing. (*Id.* at 350-51.) The defendant testified that he did not know prior to the bail hearing that the government was alleging that he had threatened another inmate at the NCCC. (*Id.* at 439.) The defendant also stated that he had never threatened anyone. (*Id.* at 437, 440.)

On August 15, 2013, the defendant was called to Central Islip to meet with Mr. Jenks in the U.S. Marshal's pens. (*Id.* at 351-52.) The defendant testified that, at that meeting, he "specifically ask[ed] Mr. Jenks for specific dates and times of the alleged crimes" as well as whether he had looked into the phone records and whether he could look into other phone, work, or school records. (*Id.* at 353.) The defendant testified that Mr. Jenks told him that he "was looking into it" and was going to subpoena those records. (*Id.*) The defendant also stated that, during his first meeting with Mr.

Jenks in NCCC, Mr. Jenks had brought up the idea of him taking a polygraph or being placed in a live lineup, and thus, at the August 15 meeting, the defendant followed up about those ideas and Mr. Jenks told him that the government was opposed to "either or both" of those ideas. (*Id.* at 354-55.) The defendant testified that Mr. Jenks told him that the government wanted to take pictures to determine whether he had a "scar or tattoo or something on [his] leg," but that Mr. Jenks instructed him not to cooperate unless there was a court order to do so. (*Id.* at 355.)

The defendant testified that, when he was called on September 30, 2013, he refused to be produced because he was told that he was going to the Brooklyn courthouse for a court date, but he did not know that he had a court date; thus, he "told the marshal that I didn't have a case in Brooklyn and that my lawyer wouldn't be there and that I didn't want to go." (*Id.* at 355-56; *see also* Def. Ex. 103.) The defendant testified that, after he refused to be produced, he called his mother, who got in contact with Mr. Jenks and relayed the message that the defendant refused to be produced and "didn't know anything about going to court." (Tr. at 356.) The defendant stated that Mr. Jenks told Mrs. Velasquez that he would be calling the defendant to Central Islip to have photographs taken in Mr. Jenks's presence. (*Id.* at 356-57.) The defendant testified that, when the pictures were ultimately taken, it was pursuant to a court order, and the government took pictures of his head, hand, and legs. (*Id.* at 367.)

The defendant testified that there was no requirement for the recipient of calls to set up a Global Tel Link account in order for an inmate to make phone calls at the MDC; rather, an inmate can call anyone so long as the recipient accepts the call. (*Id.* at 357.)

The defendant testified that he called Mr. Jenks's office "a few times" from the MDC, but "never received an answer. No one ever picked up." (*Id.* at 358-59.) The defendant testified that he asked Mr. Jenks for his cell phone number, but that Mr. Jenks told him that he "did not give his cell phone, his personal number, to clients" and also that "he didn't like to communicate by the phone, or by any means for that matter, other than in person, because he didn't want for things to be recorded [by] the government." (*Id.* at 359.) The defendant testified that Mr. Jenks did not want to communicate by e-mail for the same reason and that he did not get Mr. Jenks's e-mail address until after the trial, though he regularly communicates with his family and new counsel via e-mail. (*Id.*) The defendant testified that as a result, he was limited to communicating with Mr. Jenks through his family. (*Id.* at 360.)

The defendant testified that he had another court appearance on November 26, 2013, when the S7 indictment, which expanded the charges against him, came down. (*Id.* at 360-61.) The defendant stated that he was not given a copy of the indictment from Mr. Jenks that day, nor at a later date. (*Id.* at 361.) However, the defendant admitted that when asked by the Court on November 26, whether he had sufficient time to review the S7 indictment and discuss it with Mr. Jenks, he said yes. (*Id.* at 433.)

The defendant testified that Mr. Jenks called him to the Central Islip courthouse on December 19, 2013, where they had a meeting in the pens. (*Id.* at 363-64.) The defendant stated that Mr. Jenks did not give him or review any documents at this meeting, and remembered Mr. Jenks "getting angry" at him for asking about phone records, the dates of the crimes, conducting a polygraph or lineup, and for

grand jury minutes, as well as for doing his own research at jail and bringing suggestions to Mr. Jenks. (*Id.* at 364-66.) The defendant stated that Mr. Jenks told him "that it was the government's burden of proof to prove the case and that we didn't have to go after the phone records; that it was not our job to prove my innocence; that it was their burden of proof to prove that I was guilty." (*Id.* at 365.)

The defendant testified that, from the time he saw Mr. Jenks in December or January, he did not see or communicate with him again the trial, and they did not have any meetings about a defense, strategy, alibi evidence, or anything else. (*Id.* at 368.)[13] The defendant testified that he was "left with no choice but to speak through my family members" and would therefore call either his mother or brother and have them relay his messages to Mr. Jenks. (*Id.* at 368-69.) The defendant testified that, although Mr. Jenks saw him occasionally before or after court appearances, it was "two or three times at most" and "[t]here were many times I was waiting down there, hoping they would call me to come downstairs, whether before or after. . . . [a]nd a lot of times I didn't understand what happened in the courtroom and I need him to explain to know what exactly . . . happened and what they were talking about." (*Id.* at 369.) The defendant also testified that Mr. Jenks never discussed the purpose of, or strategy for, the identification hearing, which was held on April 7, 2014, with him. (*Id.* at 372.)

---

[13] The prosecution played a recording made on January 8, 2014, to attempt to refresh the defendant's recollection as to whether a second reverse proffer was held on that date. (*Id.* at 468-70; Gov. Exs. 105A, 105B.) However, the defendant testified that he did not recall a meeting on that date, nor a discussion of the crimes he was charged with, including the dates of the crimes, or the review of a plea offer. (Tr. at 470.)

The defendant testified that he first met with Mr. Ponze on March 25, 2013, after his court appearance. (*Id.* at 374, 401-02.)[14] The defendant agreed with Mr. Ponze's description of their relationship as acquaintances and "pretty much everything he described." (*Id.* at 401.) The defendant agreed that Mr. Ponze's e-mails to Mr. Jenks were accurate as to what he wished conveyed to Mr. Jenks. (*Id.* at 402.)

The defendant testified that he was not given any discovery through the duration of the case, and that the only papers he was provided were the plea agreement and a copy of the S4 indictment, months after it came down. (*Id.* at 362.) The defendant testified that he never saw a copy of the government's March 24, 2014 letter discussing possible 404(b) evidence, other crimes evidence, and conspiracy evidence, or the government's April 17, 2014 letter that gave the dates of the robberies charged in the conspiracy count, nor did Mr. Jenks discuss these letters with him. (*Id.* at 370-71.) The defendant testified that he learned about 3500 material from other inmates and research in the law library, and asked Mr. Ponze to ask Mr. Jenks whether he would be provided with his 3500 material. (*Id.* at 373.) The defendant testified that he never saw or went over the 3500 material with Mr. Jenks, Mr. Ponze, or anyone else, nor did he receive any discovery or trial exhibits prior to trial. (*Id.* at 374-75.)

The defendant said that, once trial began, he saw many binders on the defense table,

which included police reports with dates and addresses, and he "started to write down some of the dates" that he saw and asked Mr. Kahn, Mr. Jenks's assistant, whether he could look through the books, which Mr. Kahn permitted. (*Id.* at 375-76.) The defendant testified that, as he looked through the binders, he saw that the government was looking to use a black Impala as evidence against him, prompting him to alert Mr. Kahn that he did not own the car at the time the government was accusing him of having it. (*Id.* at 376.) The defendant testified that Mr. Kahn told him that "it was too late at that point to bring it up" and "[n]othing was done about it" because they had already stipulated to putting it into the record (*Id.* at 376-77.) The defendant testified that he was in an accident in 2008 in which his Impala was destroyed and had to be towed. (*Id.* at 379.) The defendant stated that his family had photos that he had previously taken of his totaled car, but did not know that the car was going to be an issue before the trial. (*Id.* at 379-80.) The defendant did not know whether his family tried to give these photos to Mr. Jenks or Mr. Kahn during the trial. (*Id.* at 380.) The defendant also stated that he "didn't have any communication with Mr. Jenks during the trial . . . because he was so busy he didn't want me to bother him." (*Id.* at 377.) As a result, the defendant said that he only could speak to Mr. Kahn, although there were times when he "tried to interrupt [Mr. Jenks] and convey messages in between breaks, but I had no real communication with him." (*Id.*)

The defendant stated that he was surprised by the testimony about his scars and brought it up to his parents, Mr. Jenks, and Mr. Kahn. (*Id.* at 378.) The defendant also testified that he did not speak Spanish and that Mr. Jenks never asked him whether he spoke Spanish before the trial. (*Id.* at 380.) The defendant testified that, once he

---

[14] The defendant acknowledged that he told the Court that he received a copy of the S8 indictment at this appearance and had sufficient time to review it with Mr. Jenks. (*Id.* at 434-35.) The defendant testified that he did not personally receive it, but answered that he had because he "took it as if Mr. Jenks is receiving it on my behalf." (*Id.* at 435.) The defendant testified that he "expected that Mr. Jenks at some point would go over" the indictments with him, but "he just never did." (*Id.* at 436.)

heard allegations that he spoke Spanish at the trial, he mentioned to Mr. Jenks that he did not speak Spanish, which prompted Mr. Jenks to ask the witness whether he knew if the defendant spoke Spanish. (*Id.*) The defendant also testified that he believes that Mr. Kahn contacted Scott Velazquez to attempt to obtain defendant's work records through his union, which was the wrong place to look for work records because they should have gone to the contractor; however, the defendant could not assist them in trying to obtain the work records because he was incarcerated. (*Id.* at 381-82.)

The defendant testified that, as the trial progressed, he believed that Mr. Jenks would be putting on a defense case. (*Id.* at 382.) The defendant testified that, at some later point during the trial, Mr. Jenks advised him that "things were going our way" and that they would not be putting on a defense. (*Id.* at 382-83.) The defendant stated that Mr. Jenks told him that he spoke with his family and they all thought it was best for him not to testify. (*Id.* at 383.) The defendant testified that he was surprised and "devastated" that they were not putting forth a defense because he felt like he "wasn't doing anything to prove [his] innocence." (*Id.* at 383-84.) The defendant admitted that he was certainly aware by April 30 that Mr. Jenks was not going to put on a defense case and that he was not going to take the stand, when the defense agreed to offer all exhibits at the end of the government's case as exhibits and the defendant indicated that he did not wish to testify. (*Id.* at 422-28.) However, the defendant testified that it did not occur to him to raise the fact that he wanted to put on witnesses with the Court and he did not know if he could "speak up." (*Id.* at 429.) The defendant testified that, if given the opportunity, he would have wanted to put in evidence of phone records, work records, school records, and records of

union meetings and specialty courses he attended as an apprentice to try to establish an alibi. (*Id.* at 474.)

The defendant testified that, after he obtained new counsel in December 2014, he was able to obtain alibi evidence, including his phone records and DMV records. (*Id.* at 384.) The defendant testified as to his subpoenaed phone records from the dates of the crimes. (*Id.* at 384-395.) The defendant testified that his phone records indicate that he was never in New Jersey with his phone from December 20-22, 2008, when the New Jersey burglary (of which he was acquitted) was alleged to have occurred. (*Id.* at 385-86.) The defendant testified that on January 13, 2009, a potential date of the Whitestone/152nd Street robbery which occurred at about 3:30 p.m., his phone records indicate that he was in Woodhaven, New York, where he was living at the time. (*Id.* at 387-88.) The defendant testified that his phone records for January 29, 2009, at 9:30-10:00 p.m., when he was charged with robbing a doctor's office in Fresh Meadows (a charge of which he was acquitted), show that he was in Jamaica, New York. (*Id.* at 388.) The defendant testified that he started work with his union on March 2, 2009, the morning of the Glen Oaks robbery, which occurred around 2:30 a.m. (*Id.* at 389-91.) The defendant testified that he was concerned with going to bed early on March 1, because he had to wake up at 4:30 a.m. to report to his job. (*Id.* at 390.) The defendant's phone records indicate that his last call on March 1, 2009, was an incoming call at 10:21 p.m., and the defendant testified that he went to sleep after that phone call until he woke up at 4:30 a.m. (*Id.* at 390-91.) The phone records show that defendant's first call on March 2, 2009, was at 11:52 a.m., which plaintiff testified was a call made on his lunch break to his civil attorney handling a case regarding his motorcycle accident. (*Id.* at 392.) The

defendant testified that his cell phone and work records put him in Manhattan during the November 23, 2009 99th Street and St. Johns Place robberies. (*Id.* at 395.) The defendant testified that he was working at the United Nations on November 23, 2009 because the contractors would shuffle around individuals when more people were needed for certain jobs. (*Id.* at 393-94.)

On July 16, 2013, the defendant was transferred to the MDC, but was not made aware of why he was transferred. (*Id.* at 351, 402-03.) The defendant testified that, once he arrived at the MDC, he was kept in the intake unit, G41, for three days until he was transferred to his main unit. (*Id.* at 403.) The defendant testified that there were two orderlies working in G41, who he did not know at the time but later found out were Billy Menegos,[15] another co-defendant, and Timothy Glass. (*Id.*) The defendant testified that Menegos approached him to give him a form to set up his e-mail and "in casual conversation he asked [the defendant] what the scar on [his] neck was from." (*Id.* at 404.) The defendant told him that the scar was from a tracheotomy from a motorcycle accident and testified that he gets asked "all the time" about his scar so he did not think anything of it. (*Id.*) The defendant also testified that he had contact with Glass because Glass handed out clothes to all the new inmates and had a list of everyone's names. (*Id.*) The defendant stated that he did not recognize Glass and had never seen him before, and that Glass did not say anything to him. (*Id.* at 404-05.)

The defendant also testified about his scars. He stated that the scar across his eye was from when he was hit in the eye by a swing in elementary school, requiring multiple stiches. (*Id.* at 410-11.) The

defendant testified that he never told Glass or anyone else that his eye scar was from a motorcycle accident. (*Id.* at 411.) The defendant further testified that he does not have any scars from dog bites, or any scars at all, on his hands, and that he does not have any scars on his legs. (*Id.*) The defendant also testified that he had never owned a pit bull. (*Id.* at 406.) The defendant stated that there was redness on his leg in the government's photograph that was introduced as an exhibit at trial because his sock left a red mark on his leg. (*Id.* at 411.) The defendant then showed his legs to the Court, and there was no visible scar or redness on either of his legs. (*Id.* at 411-13.) The defendant testified that his 1999 motorcycle accident required major surgery that caused a scar from the bottom of his chest to below his belly button, which the defendant showed the Court. (*Id.* at 414-16.) The defendant testified that, when he heard Glass misidentify his scars during the trial, he mentioned it to Mr. Jenks, and his mother also brought in photographs to show Mr. Jenks that the scars were not from the motorcycle accident. (*Id.* at 417.) The defendant testified that he was not privy to the conversations between his mother and Mr. Jenks, but that the photos were not used at trial. (*Id.* at 417-18.)

### 7. Sharon Moses

Sharon Moses, Mr. Jenks's office manager and administrative assistant, testified on April 22, 2016. Ms. Moses testified about the office procedures for handling communication with clients and filing client information generally, as well as how the defendant's case was handled specifically.

Ms. Moses testified that she met Scott Velazquez at the end of January 2013 in connection with opening a file for defendant's case, and that Detective

---

[15] The hearing transcript incorrectly refers to Menegos as "Maningos."

Velazquez instructed her not to send paperwork to the jail but rather to give it to him, which she noted in the defendant's file as well as in defendant's client profile on the computer. (Tr. at 483-87; *see also* Gov. Exs. A, B.) However, Ms. Moses testified that she did send a copy of a proposed plea agreement to the defendant in prison in February 2014. (Tr. at 491-92; *see also* Gov. Ex. F.)

Ms. Moses testified that Scott Velazquez called "very frequent[ly]" throughout defendant's case – "[h]e was in contact with the office weekly, on a daily basis, every other day" – and that Marilyn Velazquez started calling "towards the middle, more towards the end of the case." (Tr. at 488.) Ms. Moses testified that she never received a call from the defendant during the time when Mr. Jenks represented him. (*Id.* at 489; *see also* Gov. Exs. C, D.)

Ms. Moses testified she always accepted Corrlinks requests that the office received from clients and that the defendant requested that she set up a Corrlinks account for him to communicate with Mr. Jenks after the trial concluded. (Tr. at 494-95.)

Ms. Moses testified that there was nothing that she needed to do to make it possible for inmates to call the office from prison. (*Id.* at 498.) Ms. Moses also stated that it is office procedure to accept all collect phone calls from jails and prisons even if they do not know who is calling. (*Id.* at 480.) However, Ms. Moses testified that the answering service, which takes messages when she is unavailable to answer the phone, is not authorized to accept any collect calls. (*Id.* at 502-03.) Ms. Moses testified that she has never dealt with Global Tel Link and that it is not necessary to set up a Global Tel Link account in order to receive calls from clients at the NCCC. (*Id.* at 499.) Ms. Moses further testified that

when inmates call from the MDC, they call collect. (*Id.* at 500.) Ms. Moses confirmed that Mr. Jenks's business card does not have his e-mail address or cell phone number on it, and therefore, that a client would not know either unless Mr. Jenks told him. (Tr. at 512-13.) She stated that she did not know whether Mr. Jenks took inmate calls on his cell phone. (*Id.* at 513.)

Ms. Moses testified that Mrs. Velazquez started calling more frequently in the "middle to end of the case" because "she didn't believe that Scott was telling either Adam or her what was going on with the case, so she wanted to talk to Mr. Jenks directly." (Tr. at 508-12.) Ms. Moses confirmed that Mrs. Velazquez left messages beginning at the end of November 2013, indicating that the defendant had questions regarding his case and that he wished to see Mr. Jenks. (*Id.* at 508.) For example, Mrs. Velazquez left the following messages: on December 10, 2013, "Adam wants to know what's going on. Hasn't seen you or talked to you."; on December 12, 2013, "Adam wants to see you. Hasn't talked to you. Not fair. No idea what's going on. Wants to go with motion for tomorrow. Not fair to him and his wife. Knows nothing."; on March 10, 2014, "She wants to know exactly what's going on. Adam keeps asking questions. Has no answers."; on March 12, 2014, "Saw Adam yesterday. Has lots of questions. Hasn't seen you or talked to you and wants answers. . . He's very upset that you don't visit him. Understand hard to get to Brooklyn but every week he sees guys sitting there with their attorney and you have never been to see him there and he wants to talk to you." (*Id.* at 508-10; Gov. Ex. C.)

## II. STANDARD OF REVIEW

Defendant moves for a new trial pursuant to Federal Rule of Criminal

Procedure 33. Rule 33 states, in relevant part, that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). A district court may grant a Rule 33 motion only in "extraordinary circumstances," *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009) (internal citation and quotation omitted), and only if there exists "'a real concern that an innocent person may have been convicted.'" *United States v. Parkes*, 497 F.3d 220, 232 (2d Cir. 2007) (quoting *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001)); *accord United States v. Bell*, 584 F.3d 478, 483 (2d Cir. 2009); *see also United States v. Middlemiss*, 217 F.3d 112, 122 (2d Cir. 2000) ("Granting Rule 33 motions is not favored and is done with great caution."). "The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice." *Ferguson*, 246 F.3d at 134. In deciding a Rule 33 motion, the Court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *United States v. Aguiar*, 737 F.3d 251, 264 (2d Cir. 2013) (internal quotation marks and citation omitted).

Pursuant to Rule 33(b)(1), a motion for a new trial based upon newly discovered evidence must be filed within 3 years after the verdict or finding of guilty. Fed. R. Crim. P. 33(b)(1). It is well settled that a motion under Rule 33 can be asserted for ineffective assistance of trial counsel. *See United States v. Brown*, 623 F.3d 104, 113 n.5 (2d Cir. 2010) ("[W]e hold that the proper procedural avenue for defendant who wish to raise ineffective assistance claims after conviction but prior to sentencing is a motion for a new trial pursuant to Federal Rule of Criminal Procedure 33."). Pursuant to Rule 33(b)(2), such a motion must be filed within 14 days after verdict or finding of guilty. Fed. R. Crim. P. 33(b)(2).

However, pursuant to Rule 45 of the Federal Rules of Criminal Procedure, such time can be extended, even after the time to file has expired, if there was "excusable neglect." Fed. R. Crim. P. 45(b)(1)(B). The Second Circuit has set forth four facts that the district court should consider in determining whether the "excusable neglect" stand has been met: "(1) the danger of prejudice to the party opposing the extension; (2) the length of the delay and its potential impact on judicial proceedings; (3) the reason for the delay, including whether it was within the reasonable control of the party seeking the extension; and (4) whether the party seeking the extension acted in good faith." *Anderson v. Beland (In re Am. Express Fin. Advisors Secs. Litig.)*, 672 F.3d 113, 129 (2d Cir. 2011) (internal quotation marks and citations omitted).

In the instant case, although the defendant's Rule 33 motion was not filed within 14 days of the verdict, the Court finds that there was excusable neglect.[16] Specifically, trial counsel (whom defendant is now claiming was ineffective) still represented the defendant for months after the verdict on May 1, 2014, and new counsel only filed a Notice of Appearance on December 2, 2014. (Docket No. 420.) Upon being retained, new counsel had to become familiar with the case and obtain the information necessary to support the ineffective assistance of counsel claim, including the telephone records and other records. For example, in April 2015, new counsel filed a motion to compel a subpoena for certain records. (Docket No. 453.) Moreover, once obtaining the information necessary for the motion, new counsel had to prepare and file the comprehensive

---

[16] Trial counsel requested an extension of time to file a renewed Rule 29 motion on Count Eight, but never requested any extension to time to file a Rule 33 motion for a new trial. (Docket No. 325.)

motion papers on behalf of the defendant. Thus, there are compelling reasons for the delay; new counsel was clearly acting in good faith during this period of delay. In addition, the Court is aware of no prejudice to the government in granting the extension. In fact, the government does not even raise the timing issue in its opposition. Similarly, the delayed motion has not impacted the judicial proceeding in a negative manner. Accordingly, under the particular circumstances of this case, the Court finds that the failure to file the Rule 33 motion on the grounds of ineffective assistance of counsel until August 3, 2015 constitutes excusable neglect and the Court extends, *nunc pro tunc*, the time to file that motion to August 3, 2015. *See, e.g., Brown*, 623 F.3d at 113 n.5 ("We recognize that under Rule 33 a defendant must bring a motion for a new trial within 14 days of the verdict or finding of guilty, unless the court finds that the late filing was the product of 'excusable neglect.' Fed. R. Crim. P. 45(b)(2). Here, [the defendant] asserts that he first found out about the 20-year Plea Offer in a post-trial submission filed with the court in January 2007, approximately six months after the verdict. About a month later, at a hearing, [the defendant] filed his *pro se* petition alleging ineffective assistance of counsel . . . . At the time, Thompson – the allegedly ineffective attorney – continued to represent [the defendant]. On these facts, it is clear that [the defendant] has a reasonable contention to be adjudicated by the district court that his failure to move within the time specified in Rule 33 was attributable to excusable neglect."); *United States v. Frederick*, 868 F Supp. 2d 32, 43-44 (E.D.N.Y. 2012) (finding excusable neglect in belated filing of Rule 33 motion where the allegedly ineffective counsel continued to represent the defendant after the trial).

## III. INEFFECTIVE ASSISTANCE OF COUNSEL

### A. Legal Standard

Under the standard promulgated in *Strickland v. Washington*, 466 U.S. 668 (1984), a defendant is required to demonstrate two elements in order to state a successful claim for ineffective assistance of counsel: (1) "counsel's representation fell below an objective standard of reasonableness," *id.* at 688, and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694.

The first prong requires a showing that counsel's performance was deficient. However, "[c]onstitutionally effective counsel embraces a 'wide range of professionally competent assistance,' and 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690). The performance inquiry examines the reasonableness of counsel's actions under all circumstances, keeping in mind that a "'fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight.'" *Id.* (quoting *Rompilla v. Beard*, 545 U.S. 374, 408 (2005)). In assessing performance, a court "must apply a 'heavy measure of deference to counsel's judgments.'" *Id.* (quoting *Strickland*, 466 U.S. at 691). "A lawyer's decision not to pursue a defense does not constitute deficient performance if, as is typically the case, the lawyer has a reasonable justification for the decision," *DeLuca v. Lord*, 77 F.3d 578, 588 n.3 (2d Cir. 1996), and "'strategic choices made after thorough investigation of law and facts

relevant to plausible options are virtually unchallengeable,'" *id.* at 588 (quoting *Strickland,* 466 U.S. at 690). "However, 'strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'" *Id.* (quoting *Strickland,* 466 U.S. at 690-91).

The second prong focuses on prejudice to a petitioner. A petitioner is required to show that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. "Reasonable probability" means that the errors were of a magnitude such that they "'undermine[] confidence in the outcome.'" *Pavel v. Hollins,* 261 F.3d 210, 216 (2d Cir. 2001) (quoting *Strickland,* 466 U.S. at 694). "'[T]he question to be asked in assessing the prejudice from counsel's errors . . . is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt.'" *Henry v. Poole,* 409 F.3d 48, 63-64 (2d Cir. 2005) (quoting *Strickland,* 466 U.S. at 695). "'An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.'" *Lindstadt,* 239 F.3d at 204 (quoting *Strickland,* 466 U.S. at 691). Moreover, "[u]nlike the determination of trial counsel's performance under the first prong of *Strickland,* the determination of prejudice may be made with the benefit of hindsight." *Hemstreet v. Greiner,* 491 F. 3d 84, 91 (2d Cir. 2007) (internal citation and quotation marks omitted).

Moreover, in examining errors by defense counsel, the Court should "consider these errors in the aggregate" because "'[s]ome errors [] have . . . a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture.'" *Lindstadt v. Keane,* 239 F.3d 191, 1999 (2d Cir. 2001) (quoting *Strickland,* 466 U.S. at 695-96). This Court proceeds to examine defendant's claims, keeping in mind he bears the burden of establishing both deficient performance and prejudice. *United States v. Birkin,* 366 F.3d 95, 100 (2d Cir. 2004).

### B. Application

Defendant asserts that his trial counsel provided ineffective assistance by (1) failing to investigate and present alibi evidence at trial; (2) failing to investigate so as to prevent counsel from erroneously stipulating to the admission of falsely inculpatory evidence; (3) failing to investigate, which resulted in counsel's attempt to elicit false exculpatory evidence from a key government witness; and (4) failing to allow the defendant to be fully informed or to assist in his defense. As set forth below, the Court concludes that the defendant has met the high burden established under *Strickland.* With respect to the first *Strickland* requirement, petitioner has demonstrated that counsel's performance fell below an objective standard of reasonableness. Petitioner has also satisfied the second *Strickland* requirement because based on the totality of the evidence presented to the jury, there is a reasonable probability that but for counsel's errors, the result of the trial would have been different.

#### 1. Constitutionally Deficient Performance

In preparing for trial, "'[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *Lindstadt,* 239 F.3d at 200 (quoting *Strickland,* 466 U.S. at 691); *see also Wiggins v. Smith,* 539 U.S. 510, 533 (2003) ("[S]trategic choices made after less than

27

complete investigation are reasonable only to the extent that reasonable professional judgments support the limitations on investigation." (internal quotation marks and citation omitted)); *Gersten v. Senkowski,* 426 F.3d 588, 607 (2d Cir. 2005) ("[C]ounsel has a duty to make reasonable investigations, and a decision not to investigate will be reasonable only to the extent that reasonable professional judgments support the limitations on investigation." (citation and quotation marks omitted)). "A reasonable decision to forego investigation may be based on a reasoned judgment that such investigation would be fruitless, wasteful, or even counterproductive." *Espinal v. Bennett,* 588 F. Supp. 2d 388, 399 (E.D.N.Y. 2008), *aff'd,* 342 F. App'x 711 (2d Cir. 2009) (citation omitted).

Specifically, reasonable decisions not to pursue an avenue of investigation encompass cases "where counsel . . . cease[d] further investigation as a result of having discovered . . . evidence . . . to suggest that challenging the prosecution's . . . evidence would have been counterproductive, or that further investigation would have been fruitless," or where counsel has "good reason to think further investigation would be a waste." *Gersten,* 426 F.3d at 610 (citations and quotation marks omitted); *see also Robles v. Superintendent of the Elmira Facility,* No. 07 Civ. 596 (LBS), 2007 WL 2600857, at *6-7 (S.D.N.Y. Aug. 30, 2007) (finding counsel had not erred in failing to pursue potential witness that was likely to be "poorly performing" and "uncooperative"); *Hernandez v. Greene,* No. 05-CV-5291 (JG), 2007 WL 433396, at *8 (E.D.N.Y. Feb. 8, 2007) (finding counsel had not erred in failing to pursue potential witness whose account of the relevant events would not be inconsistent with prosecution's case). However, "a failure to conduct reasonable

investigation into possible alibi evidence, in the absence of such a reasonable explanation, falls below the standard of effective representation required by *Strickland.*" *Espinal,* 588 F. Supp. 2d at 399-401 (citations omitted) (finding counsel's failure to investigate whether redacted police report and other disclosed materials could have supported his alibi claims could not "be presumed to be sound trial strategy"); *see also Thomas v. Kuhlman,* 255 F. Supp. 2d 99, 109-10 (E.D.N.Y. 2003) (finding counsel's failure to investigate murder scene constituted ineffective assistance, where through proper investigation, counsel could have discovered that witness could not have seen defendant on fire escape outside victim's window on night of the murder, as she claimed, where witness testimony was "of overwhelming importance for the prosecution's case"); *Garcia v. Portuondo,* 459 F. Supp. 2d 267, 287 (S.D.N.Y. 2006) (finding counsel's belief about the strength of documentary evidence submitted to the court supporting defendant's alibi did not excuse counsel's failure to further investigate additional alibi evidence). Here, for the reasons explained below, the Court finds that trial counsel breached his duty to investigate the defendant's case diligently.

First, the Court finds that trial counsel's failure to subpoena the defendant's cell phone records was unreasonable and fell below professional norms for counsel's representation. The defendant repeatedly requested that trial counsel subpoena his cell phone records. (*See, e.g.,* Tr. at 47, 275, 348, 353, 364-66.) Trial counsel's only rationale for not subpoenaing the phone records is that he believed them to be "basically worthless . . . because the cooperators in this case [were] going to testify that all the defendants used burner phones." (Tr. at 47; *see also id.* at 53 ("Detective Holmes had discussions with Mr. Ryan, and the issue of

burner phones came up and they told me that nobody used their cell phones."); Jenks Decl. ¶ 17 ("I reiterated that, because of the burner phones, the phone records were proof of nothing.").) Although the Court "will not normally fault counsel for foregoing a potentially fruitful course of conduct if that choice also entails a 'significant potential downside,'" *Greiner*, 417 F.3d at 319, subpoenaing the phone records prior to trial entailed no "downside" at all, significant or otherwise.

Here, assuming the defendant was the person using the telephone (an issue the Court will address *infra*), the cell phone records reflect that on January 13, 2009, a potential date of the Whitestone/152nd Street robbery, the defendant was in Woodhaven, New York at the time of the robbery.[17] (Tr.

at 387-88.) The cell phone records also indicate that for the Glen Oaks robbery, which occurred around 2:30 a.m. on March 2, 2009, defendant's last phone call on March 1 was at 10:21 p.m. in Jamaica, and his first call on March 2 was at 11:52 a.m. in New York, New York. (Tr. at 389-92.) Further, defendant's cell phone records from November 23, 2009, the date of the 99th Street and St. Johns Place robberies, show that he was in Manhattan, rather than Queens, where the robberies occurred. (*See* Exs. I-L to Def.'s Mem.)[18] Such evidence would have been extremely helpful to the defendant and supported his contention that he did not participate in the robberies, and thus, the Court agrees with defendant that counsel's failure to subpoena the cell phone records was deficient performance. *See, e.g., York v. Ducart*, No. 15-CV-01521-EMC, 2015 WL 9268124, at *5-6 (N.D. Cal. Dec. 21, 2015) (finding counsel's failure to introduce cell phone records at trial was unreasonable and noting that, even though the records were "not dispositive, counsel had no strategic reason not to introduce the cell phone records. The upside of the evidence outweighed any downside because it would at the very least call into question [witness's] credibility); *cf. Jackson v.*

---

[17] The government points out that the actual date of the 152nd Street robbery is uncertain and that there is no evidence that the robbery could have occurred on January 13, 2009. (*See, e.g.*, Gov.'s June 17, 2016 Letter at 3.) Instead, the government suggests that the more likely date was January 19, 2009. However, as new defense counsel points out, the government's superseding indictment actually has the date of January 13, 2009 for that robbery, and there is a reasonable argument based upon the evidence at trial to support the view that the robbery occurred on January 13, 2009. (Def.'s June 19, 2016 Letter, at 2-3.) In short, the Court believes that it is reasonably likely based upon the indictment and evidence that the jury would have viewed the operative date of that robbery to be January 13, 2009, or, at the very least (given the uncertainty by the government as to the date), would have concluded that reasonable doubt would exist on that robbery if the defendant had an alibi for that date. The Court notes that the ability to obtain alibi evidence was complicated by the fact that the dates of certain robberies (and even which particular robberies the government intended to prove as part of the robbery conspiracy) changed in certain instances right up to the eve of trial. (*See, e.g.*, Gov.'s April 17, 2016 Letter to the Court, Docket No. 298) (amending the letter it had sent on March 24, 2014 and noting, *inter alia*, (1) that the date of the alleged robbery for the Glen Oaks Bar was March 2009 and not January 2009, (2) no evidence of the defendant's alleged participation in a robbery of a

home in Ozone Park in April 2009 would be offered at trial, and (3) the government would be offering proof of the defendant's alleged involvement in a robbery in the vicinity of St. Johns Place in Brooklyn).

[18] Additionally, the cell phone records would have been helpful to the defendant with respect to other charged crimes. For example, there is no indication from defendant's phone records that his phone was in New Jersey from December 20-22, 2008, when the New Jersey burglary occurred. (Tr. at 385-86.) Further, his phone records from January 29, 2009, at 9:30-10:00 p.m., the date of the robbery of the doctor's office, indicate that the defendant was in Jamaica, New York, rather than Fresh Meadows. (*Id.* at 388.) Defendant was acquitted of the counts that pertain to these crimes.

*Senkowski*, No. 03 CV 1965 (JG), 2007 WL 2275848, at *15 (E.D.N.Y. Aug. 7, 2007) (finding that failure to investigate and impeach witness with telephone records was not unreasonable where plaintiff failed to demonstrate "what the telephone records would prove" or "that the telephone records in question were material to [the defendant's] case").

Further, counsel's failure to obtain defendant's employment records, which would have constituted valuable alibi evidence, particularly for the 99th Street and St. Johns Place robberies, was also unreasonable. Defendant's employment records submitted in connection with this motion demonstrate that he worked a full day on November 23, 2009, from 7:00 a.m. to 2:30 p.m., at a construction site at the United Nations in Manhattan. (*See* Exs. F, G to Def.'s Mem.) Additionally, to the extent that the time for the St. Johns Place robbery was unclear, defendant's school records indicate that he was present for his computer course in the afternoon of November 23, 2009. (Ex. N to Def.'s Mem.) Such evidence would have provided important support for the defendant's contention that he was not present at either the 99th Street or St. Johns Place robberies, which occurred in Queens at 8:50 a.m. and in Brooklyn thereafter. (Trial Tr. at 497, 560, 945.)

The Court further finds that counsel's failure to investigate whether the defendant in fact owned the black four-door sedan was unreasonable. At trial, the government repeatedly elicited testimony from Odums that the defendant was connected to a black, four-door sedan, used in the 99th Street robbery. (*See* Trial Tr. at 881-84, 887-88.) The government then introduced evidence that the defendant owned such a car through a DMV record of registration that indicated that the defendant owned a black Chevrolet Impala. (Gov. Ex. 7.) However, documents

subpoenaed after the trial indicate that defendant's license plates for his black sedan were surrendered and destroyed on June 25, 2008, well before the 2009 99th Street robbery. (Ex. P to Def.'s Mem.) Further, defendant has photographs confirming that his car had been totaled in 2008 as well as proof that he gave up his car insurance effective June 26, 2008. (Exs. Q, R to Def.'s Mem.) Such evidence strongly refutes the government's argument that the defendant was connected to the robbery by this car. Given that the black car was the only piece of evidence other than cooperator testimony linking the defendant to the robberies, the Court finds that counsel's failure to investigate whether defendant in fact owned a black four-door sedan at the time of the robberies was deficient performance.[19] Further, based on the defendant's testimony that he alerted Mr. Kahn to the fact that he did not own his car in 2009 once he saw the exhibit binders during the trial (at which point, he was told it was "too late . . . to bring it up"), it appears that had Mr. Jenks discussed the 3500 material or exhibits with the defendant before trial, he would have been alerted to the fact that defendant did not own his car in 2009. (Tr. at 376-77.)

Thus, the Court finds that trial counsel's failure to investigate, specifically the failure to subpoena cell phone records, work and school records, and information regarding defendant's black Impala, was unreasonable under *Strickland*.[20] As the Second Circuit

---

[19] The Court further notes that the government's own exhibit (Gov. Ex. 7) indicated only that the defendant owned a black Impala in 2008. Counsel could have easily noticed before the trial began that the government's proof did not directly link the defendant to a black, four-door sedan in 2009 and confirmed with the defendant prior to trial whether he in fact owned the car in 2009.

[20] The Court is also concerned about the failure to place any evidence into the record, which apparently

held in *Gersten*, this was "not a case where counsel made a reasonable decision to cease further investigation as a result of having 'discovered . . . evidence . . . to suggest that' challenging the prosecution's [] evidence 'would have been counterproductive, or that further investigation would have been fruitless.'" *Gersten*, 426 F.3d at 610 (quoting *Wiggins*, 539 U.S. at 525). "Nor is this a case of 'diligent counsel . . . draw[ing] a line when they have good reason to think further investigation would be a waste.'" *Id.* (quoting *Rompilla*, 545 U.S. at 383). Instead, counsel "settled on a defense theory and cut off further investigation of other theories without having first conducted any investigation" into them. *Id.* Thus, "counsel did not have any reasoned basis to conclude that such an approach would be fruitless- and, in fact, subsequent counsel have found it quite fruitful." *Id.*

The Court also finds that trial counsel's decision to enter into a certain portion of a stipulation, Government Exhibit 10, was objectively unreasonable under *Strickland*. The Court recognizes that the decision to stipulate to certain evidence is a matter of trial strategy that is "virtually unchallengeable absent exceptional grounds." *United States v. Cohen*, 427 F.3d 164, 170 (2d Cir. 2005) (internal quotation marks omitted). However, this is one of those exceptional circumstances. A portion of that stipulation was helpful to the defense in that it stated that seven other co-conspirators in the robbery crew had failed

to identify the defendant in a photo array – including Gerard Machacek (who Glass testified was the one who introduced the defendant to the robbery crew) and Terri Ann Bedell (who allegedly committed the 152nd Street robbery with the defendant.) The stipulation also stated that the victim of the 152nd Street robbery failed to pick the defendant out of a photo array. A portion of the stipulation was helpful to the government. First, it stated that three cooperating witnesses who testified at the trial (Glass, Odums, and Lovly) had identified the defendant in a photo array. There was nothing unreasonable about trial counsel entering that stipulation because it only confirmed what had already been established during the testimony of those witnesses, and thus, was cumulative. However, another portion of that stipulation was highly problematic and extremely damaging to the defendant. Specifically, the stipulation also stated that two other individuals – Anthony Stravello and Pablo Burgos – had identified the defendant in a photo array. However, those two individuals never testified at the trial. Based upon the context of the stipulation, the clear inference was that these two individuals were also co-conspirators in the robbery crew and had implicated the defendant in the alleged criminal activity of the crew. That inference would have been factually incorrect because neither of those individuals implicated the defendant in any robberies of the Glass crew. In any event, the government would have never been able to make such an assertion without calling these witnesses to testify. *See, e.g., United States v. Billingslea*, 204 F. App'x 856, 858 (11th Cir. Nov. 7, 2006) ("[The witness] died in a car accident before [the defendant's] trial, but his photo identification of [the defendant] was admitted into evidence to obtain the conviction. . . . The circumstances

existed from defendant's relatives and friends (at a minimum) that the defendant does not speak Spanish. The government noted in its summation that the testimony by a victim of the 99th Street robbery that two robbers spoke Spanish was corroboration of Glass's testimony that the defendant and another co-conspirator spoke Spanish. (Tr. 1080.) In its summation, the government even pointed out that defense counsel suggested in questioning that the defendant does not speak Spanish, but there was no evidence to support that contention. (*Id.*)

objectively indicate that [the witness's] photo identification of [the defendant] was testimonial. . . . The *Confrontation Clause* barred admission of the testimonial identification of [the defendant] because, even though the witness was unavailable to testify at trial, [the defendant] did not have a prior opportunity for cross-examination. We therefore vacate our prior opinion and remand the case to the district court for a new trial." (internal quotation marks and citations omitted)).

When the stipulation was read out loud to the jury and the Court heard those identifications by two non-testifying witnesses, the Court was surprised and extremely concerned about the danger of unfair prejudice to the defendant. Thus, the Court *sua sponte* immediately summoned counsel to sidebar to ascertain why those individuals were in the stipulation. (Trial Tr. at 1037.) Defense counsel suggested to the Court that it was a mistake in that, at least with respect to Burgos, he had signed the stipulation a week earlier when he thought Burgos was going to be a witness. (*Id.* at 1037-38.) Initially, the Court was simply going to tell the jury to disregard those two identifications. (*Id.*) However, the Court was so concerned with the implication of that stipulation and its prejudicial effect on the defendant that it excused the jury for a break and discussed with counsel whether there was an instruction that could erase the negative inference that these individuals identified the defendant in connection with robberies or some other criminal activity. (*Id.* at 1039-41.) It was then agreed that the jury would be instructed that the identifications by Burgos and Stravello had nothing to with the case in that Burgos knew the defendant from jail and Stravello knew the defendant from their neighborhood, and those identifications should be disregarded. (*Id.* at 1039-42.) Notwithstanding that instruction, there is no question that trial

counsel's performance in connection with the stipulation – namely, the failure to realize that the stipulation being read to the jury contained identifications of the defendant in an array by two *non-testifying* witnesses – was a serious error that was unreasonable under *Stickland*.

With respect to the first prong of *Strickland*, the Court has carefully considered the government's arguments in opposition, as well as trial counsel's explanations with respect to these issues, and finds them unpersuasive. As noted above, there was no strategic reason to support any of these decisions. There was no downside to obtaining the records relating to the defendant's telephone and employment in an effort to establish an alibi for the charged robberies. Moreover, the Court rejects the contention that these types of records would have been useless in this case because anyone could have been using the defendant's phone at a given time. Although telephone records do not (on their face) prove the identity of the person using the telephone at a particular time, such records can still have high probative value for either the government or the defendant because often, in conjunction with other proof, a strong inference can be drawn that it was the defendant (rather than some third party) using the cellphone at the relevant time. Here, based upon the parties who were called, and given the overall context of the telephone records and the defendant's activities and relationships, defense counsel could have made a strong argument to the jury that the defendant was the person using the cellphone at the relevant times. Similarly, although the government suggests that "there is a split among federal courts as to the reliability of using historical cell-site analysis to determine a caller's location," (Gov.'s June 17, 2016 Letter, at 5), the government has successfully introduced exactly those types of records in other trials

before this Court, and defense counsel could not have reasonably concluded that such records would be inadmissible.

Further, the Court does not agree that the defendant's acquittal on several of the counts demonstrates that trial counsel provided effective representation in all respects. Trial counsel certainly conducted vigorous cross-examination of the government's witnesses during the trial, and gave effective opening and closing statements to the jury. However, his performance in those respects does not suggest that his performance was not deficient in the other respects outlined above. *See, e.g., Green v. Lee,* 964 F. Supp. 2d 237, 258 (E.D.N.Y. 2013) ("It is axiomatic that, even if defense counsel had performed superbly throughout the bulk of the proceedings, they would still be found ineffective under the Sixth Amendment if deficient in a material way, albeit only for a moment and not deliberately, and that deficiency prejudiced the defendant." (internal quotation marks and citation omitted)); *see also Kimmelman v. Morrison,* 477 U.S. 365, 386 (1986) (a "failure to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," may be constitutionally deficient irrespective of trial performance); *Espinal,* 588 F. Supp. 2d at 401 (finding counsel's strategy of "pok[ing] holes in the prosecution's case," which was "largely successful" at petitioner's first trial, in which ten jurors voted for acquittal, "blinded him to the importance of the police reports he received prior to [the second] trial," which would have supported petitioner's alibi defense, and thus, "rendered [counsel's] vigorous defense of his client ineffective.").

Finally, trial counsel made a significant error during the cross-examination of Martin Lovly. In particular, trial counsel believed that Lovly appeared in court with the defendant during a pretrial conference on January 29, 2013, and openly stated that he (Lovly) did not know the defendant. Such an interaction would have been significant for two reasons: (1) it would have allowed Lovly to see the defendant in a suggestive setting that would have helped with any identification; and (2) it would have bolstered the defense theory that Lovly did not really know who the defendant was. During the cross-examination, trial counsel repeatedly and vigorously questioned Lovly regarding this alleged encounter. (Trial Tr. 266-68, 281-83.) Moreover, defense counsel questioned the witness in a manner that also put counsel's credibility on the line. For example, the exchange between trial counsel and Lovly included the folllowing:

> "Q. Did you turn to my client and say, who the hell are you, on January 29th, 2013? A. No. . . . Q. You are under oath. You know that? A. Yes. Q. And were you sitting right there in that chair right now? A. I don't know which chair I was sitting in at the time... Q. And you saw Mr. Valazquez[21] sitting in court with me that same day; did you not? A. I didn't pay no attention. Q. Did you make any statement to either me or Mr. Valazquez? Just yes or no? Who the hell are you? And what the hell are you doing here? A. No, I did not."

(*Id.* at 267-68.) At the end of the case, just before summations, the government introduced documentary evidence from the docket sheet and United States Marshal's Service unequivocally establishing that Lovly and the defendant never appeared in the same courtroom on January 29, 2013, or

---

[21] The defendant's name was incorrectly spelled as Valazquez in the trial transcript as well as the indictment and other documents.

any other day prior to the identity hearing. (*Id.* at 976-77, 1043-44.) Thus, it was apparent from the stipulation read to the jury that trial counsel had made a mistake in vigorously questioning Lovly on this issue.

In sum, for the reasons discussed above, the Court finds that counsel's performance, in the aggregate, fell below an objective standard of reasonableness, and defendant has met his burden of establishing the first requirement of *Strickland*.

### 2. Prejudice

The Supreme Court has made clear that "a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Strickland*, 466 U.S. at 696. Consequently, if the conviction is supported by overwhelming evidence, even serious errors by trial counsel would not warrant granting relief under *Strickland*. *Lindstadt*, 239 F.3d at 204 *see also Wynters v. Poole*, 464 F. Supp. 2d 167, 176 (N.D.N.Y. 2006) ("[T]he determination of prejudice necessarily is affected by the quantity and quality of other evidence against defendant." (citing *Strickland*, 466 U.S. at 695)). Where the Second Circuit has found insufficient prejudice, the evidence against defendants was very strong, and counsel's error (or purported error) minor in comparison. *See, e.g., Murden*, 497 F.3d at 199 (finding insufficient prejudice from counsel's failure to investigate certain non-eyewitnesses who could have supported particular defense, where testimony of multiple eyewitnesses contradicted this defense); *Hemstreet*, 491 F.3d at 91-92 (finding prosecution's case "independently strong" even if counsel erred where, *inter alia*, defendant "arguably confessed" to murder to "two separate individuals"); *Bennett v. Fischer*, 246 F. App'x 761, 765 (2d Cir. 2007) (finding that

even if counsel had interviewed alibi witness, witness was not credible and would have contradicted defendant's version of events); *Lynn*, 443 F.3d at 253 (finding insufficient prejudice in part because jury was already aware of evidence counsel failed to admit); *Bridges v. United States*, No. 04 Civ. 2715 (HB), 2005 WL 1798084, at *4-5 (S.D.N.Y. Aug. 1, 2005) (failing to find prejudice due to failure to call defense witnesses and a voice exemplar where prosecution presented, *inter alia*, accomplice testimony and recordings of defendant's incriminating conversations with accomplices).

On the other hand, the Second Circuit has found sufficient prejudice to warrant relief where defense counsel failed to conduct investigation that "could have vastly increased the opportunity to cast doubt on . . . critical evidence." *Bell v. Miller*, 500 F.3d 149, 156 (2d Cir. 2007); *see also Linstadt*, 239 F.3d at 204 (finding prejudice where counsel failed to investigate witness that could have undermined the credibility of the prosecution's eyewitness); *Batten v. Griener*, No. 03-MISC-0066 (JBW), 2003 WL 22284187, at *8 (E.D.N.Y. Aug. 26, 2003) (finding prejudice sufficient to warrant *habeas* relief where, *inter alia*, counsel failed to take sufficient steps to secure material witness for trial who would have called into question the testimony of the government's lone eyewitness); *Bohan v. Kuhlmann*, 234 F. Supp. 2d 231, 254 (S.D.N.Y. 2002) (finding prejudice sufficient to warrant *habeas* grant where counsel failed to file alibi notice).

The Court has carefully considered the totality of the prosecution's case against the defendant, and finds that "[t]his [was] a case of underwhelming evidence. . . . All of the evidence against [the defendant] was affected by his counsel's failures." *Linstadt*, 239 F.3d at 205. Given that the

verdict was based essentially on the testimony of cooperating witnesses and the defendant's alleged ownership of a black four-door sedan, the Court concludes that there is a strong likelihood that counsel's errors were pivotal to the outcome of the case. The introduction of alibi evidence through defendant's phone, work, and school records and evidence that the defendant's car was totaled in 2008 likely would have substantially undermined this weak case.

The only physical evidence connecting the defendant to the crime was the black four-door sedan. However, defendant's records indicating that his car was totaled in 2008 sharply call into question the government's argument that the defendant was connected to the robbery conspiracy based on his car. Had evidence that the defendant's car had been totaled and the plates surrendered in 2008 been introduced, trial counsel would have discredited the government's attempt to link the defendant to the robberies based on his ownership of a black four-door sedan, which was a crucial component of its case that was stressed in witness testimony, (*see* Trial Tr. at 881-84, 887-88), as well as the government's summation. (*See id.* at 1090 ("What were they in? A four-door black sedan. You heard about that car many times that the defendant was in and his partner was in. What did the government put into evidence? Government's Exh. 7. Who had a four-door sedan? Adam Todd Valazquez, the defendant.").)

Further, there were no witnesses, other than co-conspirators, who could directly connect the defendant to the crimes. Critically, even without this additional evidence undermining the government's case, the key cooperating witnesses in this case – Timothy Glass and Martin Lovly – had substantial credibility issues. Glass's

second identification of the defendant was in a photo array in which he identified two individuals, which Detective Holmes testified had never occurred in any other identification he had done over thirty years, and there was nothing in Detective Holmes's notes regarding this identification. (Tr. at 220-22; *see also* Def. Ex. 281.) Additionally, Glass had credibility issues. During the trial, he admitted that when he initially cooperated with the NYPD in 2009, he "was pretty much making things up" and "totally lying" about the robberies and who was involved in them. (Trial Tr. at 727-30.) Glass also cooperated two years before identifying the defendant, and once he ultimately identified the defendant, he did not know his name, but rather, referred to him interchangeably as either "Rob" or "Alex." (*Id.* at 610-11, 635-36, 695, 726.) Glass also had stated that the defendant had the following personal characteristics: (1) he had a scar on his hand from a dog bite (Def. Ex. 285);[22] (2) he was "in his early 20s" at the time of the robberies (Trial Tr. at 731); and (3) he spoke Spanish (*Id.* at 573). However, all of these descriptive characteristics appear to be inconsistent with those of the defendant. It is undisputed that the defendant has no scar on his hand from a dog bite, or anything else. Second, given the defendant's date of birth of August 22, 1978, (Gov. Ex. 7), he was over 30 years old at the time of the alleged robberies. Third, there is no evidence in the record that the defendant speaks Spanish (and both the defendant and his family testified at the hearing that he does not). (*See* Tr. at 141, 380.)

---

[22] The government repeated this allegation in a pre-trial letter, dated July 31, 2013, to the Court: "Valasquez, also was involved in the planning for the armed robbery of a doctor's office on 188th Street and Horace Harding Boulevard, Queens, New York but was unable to carry a gum [sic] because of an injury to his hand caused by a dog bite." (Docket No. 198, at 3.)

The substantial weaknesses in Glass's testimony is further reflected in the fact that his testimony was not corroborated by other government cooperating witnesses who did not testify. In particular, Glass told investigators that Machacek had extensive contacts with the co-conspirator whom Glass had picked out as the defendant, including that: (1) Machacek introduced Glass to the defendant "at the end of '08" (Trial Tr. 416-17, 588, 677, 693); (2) Machacek was in the presence of the defendant "many times" and "vouched for [defendant] and trusted him" (Id. at 685, 725); (3) Machacek participated in the charged New Jersey warehouse burglary with the defendant (Id. at 423-42); (4) Machacek and the defendant drove together to commit the charged doctor's office robbery (Id. at 465, 469-71); (5) Glass, Machacek, and the defendant robbed the Glen Oaks Bar together (which was part of the charged robbery conspiracy) (Id. at 481-86); and (6) Glass, Machacek, and the defendant burglarized a construction company and all left there in the same vehicle (Id. at 473-75). However, Machacek, who is a cooperating witness with the government, was present with three photo arrays containing the defendant's photo, and failed to identify the defendant at all. (Apr. 7, 2014 Hrg. Tr. at 11, 21; Trial Tr. at 1035; Trial Ex. 10; Tr. at 6.) Similarly, Teri Bedell, who was a co-conspirator and Glass's girlfriend, also was a cooperating witness for the government. Bedell participated in several of the charged robberies against Velazquez, including the 152nd Street robbery, the doctor's office robbery, and the New Jersey warehouse robbery. (Trial Tr. at 451-54, 586-88.) However, Bedell also did not identify the defendant as a participant in those robberies. (Tr. at 6; Trial Ex. 10.)

Cooperating witness Martin Lovly also had substantial credibility issues. Initially, Lovly did not positively identify the defendant when shown a photo array, but rather, just indicated that he had seen him at Ralphie's barber shop. (See Def. Ex. 261; Tr. 240-42.) Ultimately, Lovly positively identified the defendant as an accomplice for the robbery one week later, without being shown another photo array; rather, Lovly indicated that he was now "100 percent sure" after thinking about the photo array for one week. (Tr. at 243-44; see also Def. Ex. 262.) That delayed identification was further undermined by the fact that (1) the robbery had occurred five years earlier, and Lovly had been involved in dozens of robberies (Trial Tr. at 252); and (2) Lovly said he met the defendant only an hour before the crime, and the defendant was wearing a hoody (Id. at 225-26, 302); and (3) Lovly was on heroin at the time of the robbery. (Id. at 375.) Lovly also incorrectly told investigators that the defendant was a "dark skinned Dominican[]." (Id. at 314-15.)[23]

Based upon the jury's verdict, there is no question that the jury had issues with the credibility of the cooperating witnesses, including two of whom identified the defendant as having been involved in the 152nd robbery – that is, Glass and Michaelides. For example, the jury acquitted the defendant of the interstate transportation of stolen property charge relating to the New Jersey Warehouse burglary, even though both Glass and

---

[23] The government has a third cooperating witness, Athanasios Michaelides, who testified, among other things, about the defendant's involvement in the 152nd Street robbery. However, Michaelides never identified the defendant prior to trial, but rather identified the defendant for the first time during the trial. Moreover, prior to trial, Michaelides and defendant had interacted as co-defendants on the prison bus and in the courtroom, and Michaelides acknowledged that he told Velazquez that he had no idea who he was or what he was doing there. (Trial Tr. 999-1001, 1007.)

Michaeledes testified that the defendant was involved in that crime. Similarly, the jury acquitted the defendant of the Advanced Dermatology robbery, even though Glass testified as to the defendant's involvement in that robbery.

In short, given the substantial weaknesses in the government's case, the Court is firmly convinced that, but the above-referenced errors by trial counsel, the jury would not have returned a guilty verdict on any count.

The Court has considered the government's arguments on the "prejudice" issue and finds the arguments unpersuasive. One of the government's primary arguments is that, even assuming there were issues with defense counsel's performance, those issues did not relate to key evidence offered by the government. For example, in its supplemental letter, the government suggests that there were no issues regarding the effectiveness of the cross-examination of Martin Lovly. (*See, e.g.,* Gov.'s June 17, 2016 Letter, at 2 ("Trial counsel's cross-examination of Martin Lovly was thorough and not the subject of any meritorious criticism. In particular, there is simply no identified omissions nor inadequacy in the performance of trial counsel regarding the questioning of Martin Lovly.").) Thus, the government contends that the convictions should stand because the jury, under the law, could have convicted the defendant based solely on the uncorroborated testimony of an accomplice, such as Lovly. *See id.* at 1 ("Under the controlling standard, that testimony [by Martin Lovly] is sufficient, in and of itself, to uphold defendant's conviction on the 152nd Street Hobbs Act robbery. It also is sufficient to uphold the convictions for the narcotics trafficking conspiracy conviction and the money laundering conviction." (citations omitted)).

The government frames the question incorrectly. Obviously, under federal law, a jury could convict a defendant based solely on the uncorroborated testimony of a single accomplice if the jury believes that witness's testimony establishes guilt beyond a reasonable doubt. *See United States v. Parker*, 903 F.2d 91, 97 (2d Cir. 1990). However, on an ineffective assistance of counsel claim, the issue is not whether *could* the jury have convicted the defendant in the absence of defense counsel's errors; rather, the question is whether the jury *would* have convicted the defendant but for those errors. In the instant case, having presided over the trial and witnessed the errors in the context of the government's entire case, the Court firmly believes the answer to that question is that, in the absence of the errors by defense counsel, there is a high probability that the jury would not have convicted the defendant on any counts based upon Lovly's testimony alone, or in conjunction with all of the government's evidence.

First, the government is incorrect in its assertion that none of the alleged errors related to Lovly's testimony. As discussed *infra*, trial counsel aggressively questioned Lovly and accused him of admitting at a pre-trial conference with the defendant on January 29, 2013 that he (Lovly) did not know who the defendant was. However, that extensive line of questioning turned out to be an error by counsel – Lovly was not present at that conference, and counsel apparently confused Lovly with another co-defendant. Although this may seem like a minor error in the abstract, the error was magnified, as discussed above, because of the nature and tone of questioning by trial counsel. Moreover, the government attempted to capitalize on this error by emphasizing it in the summation, and linking the error to the defendant himself by suggesting that this showed that the defendant and his counsel were engaged in

wild speculation, while Lovly was testifying carefully and truthfully. Specifically, the prosecutor read the back and forth on this issue to the jury from the transcript, and said this:

> That is Mr. Lovly being careful. *That is defendant and defense counsel asking you to speculate.* Because what has happened today, ladies and gentlemen, is there is a stipulation. There is a stipulation, ladies and gentlemen, in which the parties agree that despite all those questions, all those questions you heard about, 'didn't you say who the hell are you?' Didn't you say that to Mr. Valazquez?' And all that. You heard that question and you heard that answer. You heard that. What does the stipulation now say that has been entered into? What does that say that Mr. Ryan read you this morning? It says the defendant Valazquez and Martin Lovly were never together in court in a marshal's bus or elsewhere until Lovly testified at a pretrial hearing in this case on April 7th, 2014. All those questions you heard about what was said in court, defense counsel asking question after question of Martin Lovly, he wasn't there. And they can now read he wasn't there. So where is the basis for those questions? *What is being done there is a way – those questions are about credibility. . . . It is an attack on his credibility. And Mr. Lovly, ladies and gentlemen, was, as the photo pack show, as his observations of the defendant during that robbery show, was a careful witness, telling you only what he recalled, what he observed, what he saw.*

(Trial Tr. at 1085-86 (emphasis added).) Thus, it is the Court's view – in light of (1) the nature and timing of the error, (2) the government's utilization of the error in its summation to bolster Lovly's credibility, and (3) the government's suggestion that trial counsel's error was a desperate attempt at speculation by counsel and his client – that it is highly likely that this error not only helped Lovly's credibility, but hurt the defendant's credibility with the jury. *See generally Henry v. Poole*, 409 F.3d 48, 65 (2d Cir. 2005) ("It is axiomatic that exculpatory statements, when shown to be false, are circumstantial evidence of guilty consciousness and have independent probative force." (quotation marks and citation omitted)).

Second, the damage to the defendant's case from the error regarding the stipulation containing identifications of two non-testifying witnesses was not linked to a particular witness or even a particular robbery; rather, by suggesting that the government had two additional co-conspirators who identified the defendant, it had the potential impact to bolster the government's entire case, including the credibility of Mr. Lovly and the other cooperating witnesses. Although the Court gave a limiting instruction, the Court is extremely concerned that the specter of identifications by two other co-conspirators had an impact on the jury's decision to convict.

Third, even with respect to the errors that related to robberies other than the 152nd Street robbery (such as the 99th Street robbery), the Court believes that there was a "prejudicial spillover" with respect to the counts of conviction. In its summation, the government repeatedly referred to the robberies together in an effort to bolster the credibility of the cooperators on each individual robbery. For example, although

there were not four cooperating witnesses for any individual robbery in the case (and, in fact, several of the robberies had only one cooperating witness), the government repeatedly referred to the "four" cooperating witnesses together and also referred to cross-corroboration. (*See, e.g.*, Trial Tr. at 1076-77 ("As Mr. Ryan told you last week, this is not a case of a lone gunman. It is a lone gunman part of a crew. Adam Valazquez was part of Timothy Glass' robbery crew for a number of different robberies. You have four different members of that crew who identified Mr. Valazquez in court as part of that robbery crew. And they corroborated each other as to place and as to different places."); *id.* at 1082 ("What you have here, ladies and gentlemen, is extensive cross corroboration. Look at 152nd Street. Look at that."); *id.* at 1094 ("And what you are left with here, ladies and gentlemen, I believe, is four members of the crew coming in here and saying, yep, I know him. And they know him from different places and they remember him from frequent and memorable encounters."); *id.* at 1128 ("Do you know what that means? That means that he is more unlucky than anybody who ever won a lottery. Because what are the chances, the mathematical chances, that four individuals separately questioned in separate years at separate times would all pick out as the person and provide the details as to the same crime or series of crimes. That is unbelievably remarkable."); *id.* at 1135 ("Now, you know these crimes happened. The only decision, the only decision you have to make is whether this defendant (indicating) is the unluckiest person in the world because four robbery crew members, separately, at separate times, under separate debriefings and sometimes in separate years, identified him as being a member of his crew, or whether in truth, justice and the facts showed that he did do these things.").) The Court is not suggesting at all that there

was anything inaccurate or improper about these arguments – such statements certainly constitute fair argument based upon the evidence. However, because this case was tried in this particular manner, there is a much greater risk that errors by defense counsel in connection with a particular charged crime spilled over into all aspects of the case. Similarly, the Court believes that the alibi evidence that was not presented to the jury (including phone records, employment records, and school records) was so significant with respect to certain robberies (such as the 99th Street and St. Johns Place robberies) that it was reasonably likely that it would have undermined the jury's confidence in the government's entire theory of the case and would have made them unwilling to rely solely on cooperator testimony for any of the other robberies, including the 152nd Street robbery.

Finally, to the extent that the jury would have still convicted regardless of these errors because of the ability of Glass and Lovly to identify the defendant because of certain scars, the Court disagrees. The probative value of this corroboration is significantly diminished by the fact that (1) there is clear evidence that the cooperating witnesses interacted with each other in the jail, in the courthouse, or in the Marshal's bus, prior to testifying at the trial (Trial Tr. 264-66, 574, 577, 795-96, 812-13, 833, 836-39, 954-55); and (2) Glass had interacted with the defendant in the jail (Def. Ex. 269-270; Tr. at 402-05) and would have had an opportunity to learn about such scars from such interactions.

In sum, the Court finds that, had the additional evidence been placed before the jury and had the other above-referenced errors by defense counsel not occurred, it is reasonably likely that, in light of the evidence at trial, the outcome of defendant's trial would have been different in that the

jury would not have convicted him on any counts. Because the cumulative effect of counsel's errors undermined confidence in the outcome of the trial, the Court finds that the defendant suffered clear prejudice due to counsel's constitutional deficiencies at trial and the second prong of the *Strickland* test is satisfied.

## IV. CONCLUSION

For the reasons set forth herein, the Court finds that the defendant has shown that his counsel's performance fell "outside the wide range of professionally competent assistance" and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 690. Thus, defendant's motion for a new trial is granted.[24]

SO ORDERED.

JOSEPH F. BIANCO
United States District Judge

Dated: June 24, 2016
     Central Islip, NY

\*    \*    \*

The United States is represented by Robert L. Capers, United States Attorney, Eastern District of New York, by Burton T. Ryan, Jr. and Charles P. Kelly, Assistant United States Attorneys, 610 Federal Plaza, Central Islip, NY 11722. Defendant is represented by Gail E. Laser, 314 Main Street, Suite 200, P.O. Box 566, Park City, UT 84060.

---

[24] Because the Court grants the motion on the grounds of ineffective assistance of counsel, the Court need not, and does not, address other bases for the motion, namely whether the motion also should be granted under the "newly discovered evidence" standard.